THE EQUITY CORPORATION,
Plaintiff,

and
EUGENE CASEY,
Intervening Plaintiff,

*vs.*

DAVID M. MILTON and
TRIANGLE SECURITIES CORPORATION,
Defendants.

*New Castle, September 24, 1965.*

*Richard F. Corroon,* of Berl, Potter & Anderson, Wilmington and *Richard Wait* of Choate, Hall & Stewart, Boston, Mass., for plaintiff.

*Alexander L. Nichols* and *David A. Drexler,* of Morris, Nichols, Arsht & Tunnell, Wilmington, for intervening plaintiff.

*John Van Brunt,* of Killoran & Van Brunt, Wilmington, and *Milton V. Freeman,* of Arnold, Fortas & Porter, Washington, D. C., for defendants.

MARVEL, Vice Chancellor: According to its unverified complaint, The Equity Corporation, a registered investment company, was deprived of an opportunity to acquire 1,773,665 shares of its own stock in 1963 by reason of the fact that the defendant David M. Milton, then as well as now chief executive officer of the plaintiff corporation, in alleged violation of his fiduciary duty to plaintiff, on August 9, 1963, caused his wholly owned subsidiary, the defendant Triangle Securities Corporation, to acquire options for the purchase

of the shares in dispute, thereby allegedly appropriating an opportunity, which, according to plaintiff, rightfully belonged to it. The complaint goes on to aver that: "* * * Control and ownership of large blocks of its capital stock is essential to activities of the plaintiff because they can be used in exchange offers and in other ways as a means for it to make and acquire the investments which constitute its business * * *". The complaint further alleges that plaintiff's "consistent policy" to acquire its own shares has been announced for several years; that plaintiff "* * * has made such acquisitions and it contemplates making further acquisitions * * *", which policy was not only allegedly known to the defendant Milton but developed and carried out with his assistance. It is therefore charged that Mr. Milton breached his fiduciary duty to plaintiff when he arranged for the acquisition of the aforesaid 1,773,665 shares for himself rather than for his corporation.

The specific relief sought is an accounting of defendants' profits and plaintiff's losses allegedly arising out of the appropriation complained of as well as a decree declaring that the defendant Milton, through his wholly owned subsidiary, Triangle, holds options for the acquisition of the 1,773,665 shares in question as trustee for the plaintiff subject to the parallel obligations assumed by Triangle to buy the stock in controversy at the option prices. Supplementary relief is also prayed for in the form of an order requiring Triangle to transfer its options to plaintiff upon assumption by the latter of Triangle's agreement to take up the optioned stock at the contract prices. The status quo insofar as exercise of the options is concerned has been voluntarily preserved pending disposal of defendants' motion for summary judgment.

Prior to argument on said motion, Eugene Casey, the largest stockholder of Equity other than Mr. Milton, was permitted to intervene as a plaintiff on the basis of his contention that the pending suit having resulted from his demand for correction of the alleged corporate wrong charged, his presence in the suit is required to assure vigorous prosecution of the matters complained of. In his motion to intervene, which was granted without opposition, he took the position that because of Mr. Milton's alleged domination of Equity's board,

the joining of an independent party plaintiff was required to guard against any possible collusion between the original parties. He has adopted plaintiff's complaint as his own. He has not, however, filed a brief or otherwise materially contributed to the solution of the problem presented.

Defendants admit that in August 1963, Triangle arranged for the acquisition of the shares here in controversy. They allege, however, that plaintiff's board knew of and acquiesced in such arrangements, having made it clear that it had no interest in acquiring the stock in controversy. Defendants go on to contend that in any event the acquisition of such shares by plaintiff would be violative of the Investment Company Act as well as the corporation law of Delaware. Defendants further allege that Triangle's acquisition was accomplished with the full knowledge and approval of the Securities and Exchange Commission and that inasmuch as the facts concerning the transaction were disclosed to its stockholders by plaintiff no later than on or about September 7, 1963, the present suit, which was filed on January 7, 1965, is barred by laches.

From 1933 until the end of 1962, the defendant David M. Milton maintained an equitable interest in no less than 20% of the common stock of Equity, such interest being held first through a Bahamian corporation and later by corporations organized under the laws of Panama, all of which were controlled by Mr. Milton. Stockholders have been regularly and fully informed about the nature and extent of Mr. Milton's interests in the company.

In October 1962, legislative changes in the federal tax laws made it economically inadvisable for Mr. Milton to maintain his interest in the stock of Equity in such foreign entities, and one of them, namely Darien, was instructed to arrange for the sale of such shares after linking the obtaining of an option for the shares in question with a firm commitment to repurchase. However, inasmuch as less than half of such holdings could be effectively disposed of in the domestic market prior to December 31, 1962, the deadline for meeting the requirements of the new tax law, arrangements were made to transfer Mr. Milton's interest in the stock of Equity by selling the stock of

Oceanic Trading Corporation (which controlled Darien) to a Swiss corporation known as MET Verwaltungs-Aktiengesellschaft. However, the Swiss corporation having refused on the basis of Swiss law to reveal the names of its stockholders, notwithstanding the insistence of the Securities and Exchange Commission that Equity disclose the name or names of such stockholder or stockholders, Mr. Milton resolved the corporate dilemma thereby presented by causing the defendant Triangle on August 9, 1963, to obtain options on substantially the same shares which Mr. Milton had controlled through Darien prior to December, 1962. This arrangement was reported to the stockholders on September 7, 1963. At the annual meeting held on September 24, 1963, no objection was raised to the transaction and Mr. Milton was overwhelmingly re-elected a director. And, while there have admittedly been gradations over the years in the precise degree of Mr. Milton's control over the same 20% of Equity stock here in issue, opposing counsel agree that it is essentially the block of shares which Mr. Milton sold as of December 31, 1962 that he proposes to reacquire by means of the options here in dispute. Rather than making any issue over the identity of the shares in question (there being no material differences over the foregoing facts), the points made by plaintiff are: (1) that the legal control exercised by Mr. Milton over his Equity shares was broken on December 31, 1962, and (2) that when, in August, 1963, Mr. Milton was able to secure the return of said shares to his control, he breached his fiduciary duty to plaintiff by failing to turn over such opportunity to plaintiff, it being contended that the overall option price of approximately $3.50 per share can be effectively used by Equity as a counter against the substantially higher net asset value of said shares in the course of acquiring investment assets.

In the landmark Delaware case of *Loft, Inc. v. Guth*, 23 *Del.Ch.* 138, 2 *A.2d* 225, aff'd, *Guth v. Loft Inc.*, 23 *Del.Ch.* 255, 5 *A.2d* 503, the defendant Guth, president of and in control of the affairs of the plaintiff corporation, and his corporate vehicle, the defendant The Grace Company, were ordered to account for their profits arising out of acquisition of the assets of the bankrupt National Pepsi-Cola Company, as well as to assign to plaintiff all shares of such company which Guth had caused to be registered in such defendants' names following

seizure and exploitation of a business opportunity found to belong to plaintiff.

At the time of the transaction complained of, Loft, Inc., a manufacturer of candies and the like, was a large distributor of cola syrup produced by the Coca-Cola Company. However, the price charged for this syrup being excessive in Guth's opinion he decided in 1931 to look into the possibility of purchasing the same type of product from National Pepsi-Cola Company, a relatively local southern producer, a source for syrup which he had considered several years earlier but dropped. By 1931, however, when Guth decided again to look into the possibility, National Pepsi-Cola had just been adjudged bankrupt, and the latter, through its dominant figure, a Mr. Megargel, at once evinced an interest in trying to arrange for the sale of its assets, formula, good will and trademark. A contract was made, and for a nominal amount the Pepsi-Cola formula and trademark were acquired by a newly organized company, namely Pepsi-Cola Company, in which Guth and Mr. Megargel, it was agreed, would receive equal shares.

The Chancellor found that Guth, having falsely cloaked the pending transaction as a Loft enterprise, had then proceeded to use its personnel, merchandise, money and credits to bring about not only the acquisition but the exploitation of the established Pepsi-Cola formula and trademark at a time when he personally was in financial straits. The Chancellor accordingly found Guth guilty of a breach of fiduciary duty by reason of the means employed by him to deprive his corporation of what was not a theoretical but a practical and essential business opportunity which Loft, Inc. was in a financial position to exploit. In other words, there was a clear tie between the securing of a cheap source of cola syrup for fountain sales and Loft, Inc.'s future in the soft drink business. The Court also found that Guth's conduct in using the entire resources and facilities of Loft to embark on what he sought to make into a personal Pepsi-Cola enterprise estopped him to contend that the opportunity was other than one properly enuring to plaintiff's benefit, the Chancellor likening Guth's conduct to that of a corporate officer who by using his corporation's funds to purchase real estate in his own name personally profits from the transaction,

the corporation meanwhile being liable to the risk of loss should the project prove unsuccessful.

■ On appeal, the Supreme Court of Delaware, in affirming the decree below, expressed the firm conviction that the opportunity to acquire the assets of National Pepsi-Cola belonged to plaintiff and that Guth as its president had no right to appropriate the opportunity to himself. However, both the Chancellor and the Supreme Court noted that not all opportunities of a business nature coming to the attention of a corporate fiduciary necessarily belong to his corporation, it being stated that when "* * * a business opportunity comes to a corporate officer or director in his individual capacity rather than in his official capacity, and the opportunity is one which, because of the nature of the enterprise, is not essential to his corporation, and is one in which it has no interest or expectancy, the officer or director is entitled to treat the opportunity·as his own, and the corporation has no interest in it, if, of course, the officer or director has not wrongfully embarked the corporation's resources therein." Citing *Colorado & Utah Coal Co. v. Harris,* 97 *Colo.* 309, 49 *P.2d* 429.

■■ The question of whether or not a corporate fiduciary has appropriated for himself something that in fairness should belong to his corporation is "* * * a factual question to be decided by reasonable inference from objective facts": Guth v. Loft, Inc., supra, cited in *Johnston v. Greene,* 35 *Del.Ch.* 479, 121 *A.2d* 919. In the latter case, the Supreme Court of Delaware held that Floyd B. Odlum, a corporate president and its dominating director, could not be said to have seized a corporate opportunity inasmuch as no tie between the property involved and the nature of the corporation's business had been demonstrated. Therefore, the corporation could not be said to have an actual or expectant interest in certain patents offered to Mr. Odlum in his individual capacity notwithstanding a finding that the corporate decision not to acquire the patents in issue was in fact Mr. Odlum's. In overruling the Court below, the Supreme Court declined to extend the doctrine of corporate opportunity to any and all investment possibilities coming to a director or officer of a corporation with funds to invest. In other words, there must be a showing of a tie between the

property in dispute and the business of a corporation to warrant a holding that an opportunity has been seized. In the cited case all that could be said in reference to the opportunity was that the corporation was interested only to the extent that it was concerned in making sound investments. As the Court pointed out, Odlum, being an officer and director of other investing companies, could be said to have seized the opportunity in question from such other companies as well were the doctrine not to be restricted to a showing of a tie between the property in issue and the nature of the corporate business.

First of all, there is no doubt but that the chance to acquire the options here in dispute came to Mr. Milton as an individual, the shares involved being to all intents and purposes the same in which he had held an interest from 1933 through 1962. Secondly, no Equity money or facilities were involved in the transaction. The third and critical question is whether or not a material question of fact has been raised concerning a tie between the shares in question and the nature of Equity's corporate business.

As indicated earlier, Equity is a closed-end investment company and is registered to do business under the Investment Company Act of 1940. Being a corporation, the right of its corporate officials to buy shares in their own corporation is clearly established absent a showing of some inequity in such a purchase, *Du Pont v. Du Pont* (*CA*3) 256 *F.* 124. In fact, such practice has been encouraged by option plans and the like. On the other hand, in special situations where there is a showing of a clearly established corporate policy which would make it improper or inequitable for a stockholder to take for himself a large block of stock prior to offering the opportunity to other stockholders and the corporation, such a purchase will be questioned, *Dolese Bros. Co. v. Brown,* 39 *Del.Ch.* 1, 157 *A.2d* 784.

Notwithstanding plaintiff's protestations, the papers before me contain no showing of a corporate policy on the part of the Equity Corporation to acquire its own shares in the method and amount here contemplated, assuming, of course, that such a so-called "policy" could serve other than as a device to be used in struggles for corporate

control, *Kors v. Carey,* 39 *Del.Ch.* 47, 158 *A.2d* 136. In fact, the acquisition of its own capital stock is not ordinarily an essential corporate function, *Brophy v. Cities Service,* 31 *Del.Ch.* 241, 70 *A.2d* 5. And while from 1950 to 1963, the annual reports of Equity reported the intention of management to purchase shares of Equity "* * * in the open market from time to time, as conditions may warrant * * *," no purchases of the type here involved have been made over the past twenty-five years. In fact, any purchase of its own shares by an investment company such as plaintiff is closely regulated by the Investment Act of 1940. See 15 *U.S.C.A.* § 80a-23(c)(1). Thus, in 1963, at the order of the Securities and Exchange Commission, the "market" previously referred to in the annual report was defined as the American Stock Exchange. Such report also stated that the corporation had no present plan to reissue reacquired shares, and discloses the availability of over 5,000,000 authorized but un-issued shares. According to the records filed with the Securities and Exchange Commission since 1950 (the years 1955-1958 being missing), the largest annual purchase made by Equity of its own shares was 18,605. During three such years less than a thousand shares were purchased, and in four other years no shares were purchased.

On the other hand, on several occasions in the past Equity has caused a distribution of its assets to its stockholders by asking for tenders, one such being the Friden transaction in which holders of 748,284 Equity shares exchanged them for 62,357 shares of Friden, thereby obtaining a broader public ownership of Friden stock and reaping tax advantages for Equity. Significantly, following this transaction, the stockholders voted approval of the directors' proposal that such shares be retired. Several other similar projects were proposed but were not consummated, one being a proposed exchange of Singer shares designed to give the stockholders of Equity a direct participation in Singer and to secure for Equity the same tax advantages achieved in the Friden transaction.

Furthermore, other novel and sweeping proposals advanced by Mr. Milton and rejected by the board early in 1965 would have, if carried out, changed the whole nature of Equity's business by putting it in the real estate business. The point is that such a radical change

has not taken place and clearly was not in existence in August 1963. In brief, plaintiff can point to no established policy on the part of Equity to acquire investment property in exchange for its own shares or, in fact, that it has ever done so over the past twenty-five years. The reason for the absence of such a policy would appear to lie in the fact that under § 23(*b*) of the Investment Act of 1940 (15 *U.S.C.A.* § 80*a*-23(*b*)) plaintiff is restricted from exchanging its shares for less than their current net asset value, and the market value of Equity's common stock is and has been since the inception of the matters complained of about half of its net value. No good reason has been advanced as to why anyone would agree to exchange property for Equity shares at a price for the latter fixed substantially above the market price.

■ I conclude that there is no genuine factual dispute before me concerning the propriety and good faith of the defendant Milton's dealings with plaintiff in the matters complained of or concerning the nature of plaintiff's established business and reasonable expectancies. In other words, plaintiff's alleged claim to the shares in issue must fail because the record is devoid of any genuine factual showing that the defendant Milton's reacquisition of said shares has in any way put him "* * * into competition with his company * * *", *Guth v. Loft, Inc.,* supra, or that there is any "* * * tie between that property and the nature of the corporate business * * *", *Johnston v. Greene,* supra. Defendants' motion for summary judgment will be granted.

An appropriate order may be presented on notice.