Samuel C. WOLFENSOHN and Esther Buchman, in their own behalf and in behalf of all other holders of Certificates Constituting a Charge on Income, and all other holders of 5½ percent Subordinated Income Debentures, due January 1, 2033, of the Missouri-Kansas-Texas Railroad similarly situated, Plaintiffs Below, Appellants,

v.

MADISON FUND, INC., Axe-Houghton Fund A, Inc., Axe-Houghton Fund B, Inc., Axe-Houghton Stock Fund, Inc., Axe Science Corp., Bangor Punta Operations, Inc., Missouri-Kansas-Texas Railroad Company and Katy Industries, Inc., Defendants Below, Appellees.

Supreme Court of Delaware.

April 8, 1969.

H. Albert Young and H. James Conaway, Jr., of Young, Conaway, Stargatt & Taylor, Wilmington, and Irwin M. Taylor and Shephard S. Miller, New York City, for appellants.

Louis J. Finger of Richards, Layton & Finger, Wilmington, for appellee, Bangor Punta Operations, Inc.

S. Samuel Arsht and David A. Drexler of Morris, Nichols, Arsht & Tunnell, Wilmington, and Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for appellees, Madison Fund, Inc., Missouri K. and T. R. Co. and Katy Industries, Inc.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

WOLCOTT, Chief Justice.

This is an appeal from the dismissal of a class action by the Court of Chancery. The action sought to void the acquisition by Katy Industries, Inc. (Industries) of 97% of the common stock of Missouri-Kansas-Texas Railroad Company (Railroad), or, in the alternative, to have the court declare that Industries had assumed the obligations of Railroad to the holders of its Certificates Constituting a Charge on Income and to the holders of its 5½% Subordinated Income Debentures.

Prior to 1957, Railroad experienced financial difficulties. A major reason was the mounting arrearages on its then outstanding 7% Preferred Stock which, by that year, had grown to $159 per share. Seeking to eliminate this increasing burden, Railroad's management proposed a plan to its preferred stockholders to exchange the preferred stock for different securities. The preferred stockholders agreed to the exchange, and the plan was submitted to the Interstate Commerce Commission which approved.

Accordingly, pursuant to the plan on December 31, 1958, Railroad issued new securities to its preferred stockholders. Each share of preferred stock was thereby converted into a $100 Income Debenture, a Charge on Income Certificate for $110, and one share of common stock.

Nevertheless, Railroad did not thereafter prosper. With the exception of small profits made in two of the years following 1958, it remained in shaky financial condition and became critically short of cash. No payment was ever made on the Debentures or Certificates. By December 31, 1967, the deficit in interest payments on the Debentures totaled $33,316,783. On the same date, Railroad had accumulated a net operating loss carryover for Federal income tax purposes of $31,000,000.

In view of the chronic insufficiency of its transportation income, Railroad sought to acquire non-transportation enterprises. This effort came to naught by reason of the Interstate Commerce Commission's prohibition against a railroad obligating its credit or issuing securities for the acquisition of non-transportation businesses. Consequently, because of its critical shortage of cash, Railroad was unable to diversify through its own resources.

Faced with this situation, Railroad's management and some of its major stockholders, notably Madison Fund, Axe-Houghton Fund, and Bangor Punta Operations decided to form a holding company to own Railroad and, at the same time, seek diversified enterprises which would permit utilization of Railroad's tax loss carryover. Accordingly, Industries was formed and a plan devised for the exchange of Railroad and Industries' common stock on a share-for-share basis. The exchange plan was reviewed by the Interstate Commerce Commission and the Security and Exchange Commission. In addition, the Internal Revenue Service ruled that the exchange would not result in a taxable gain or loss to Railroad's stockholders, and that Railroad's tax loss carryover would be available to offset the income of Industries and its subsidiaries. The exchange then was carried out between March 12 and May 31, 1968.*

Plaintiffs instituted this suit on May 28, 1968 seeking to have the exchange declared void, or Industries be held to have assumed the obligation of the Debentures and Certificates. The obligations in this respect are in excess of $125,000,000, which meant as a practical matter that its assumption by Industries would be to nullify the exchange.

Substantially, all of Railroad's properties are subject to the liens of mortgages which, on December 31, 1967, aggregated in excess of $98,800,000. Both the Debentures

---

* The Debenture and Certificate holders who owned 45% of Railroad's common stock exchanged it for an equal number of shares of Industries.

and the Certificates are subordinated to this senior debt.

The Debentures bear 5½% interest per annum, payable out of earnings and are cumulative to a maximum of 16½%. They are unsecured but for their protection no cash dividends may be paid on Railroad's common stock unless the equivalent of 25% of the dividend is added to the sinking fund for the Debentures. No amounts have ever been added to the sinking fund, nor have any dividends been paid on the common stock, nor has any interest ever been paid on the Debentures.

The Certificates are a charge on Railroad's income to the extent of $73,370,550. They have no maturity date and bear no interest. Railroad is obligated to pay 20% of its available income into a noncumulative sinking fund for the retirement of Certificates. No dividends on the common stock may be paid until 60% of the Certificates have been retired. No amount has ever been paid into the sinking fund for the retirement of Certificates.

In the event of the bankruptcy or liquidation of Railroad, the Debentures and Certificates have priority over the common stock but are subordinate to the senior debt.

Plaintiffs characterize the exchange as a corporate reorganization and argue that it violates their contractual rights under the Debentures and Certificates. They say it appropriates non-transportation income for the benefit of the common stockholders, thus depriving the Debentures and Certificates of the security of such income in the event of liquidation. This result comes about, it is said, by placing the Debentures and Certificates in an inferior position in the financial structure of the enterprise, and by impairing Railroad's income by making its tax loss carryover available to Industries.

It is implicit in plaintiffs' argument that the Debentures and Certificates are in the nature of corporate stock which has been ignored to its detriment in the so-called corporate reorganization. However, it is plain, we think, that the issuance of the Debentures and Certificates created a debt-or-creditor relationship. The Debenture is a promise by Railroad to pay a stated sum out of income, and the Certificate is a charge upon income in a stated amount.

■ The question of whether or not the holder of a particular instrument is a stockholder or a creditor depends upon the terms of his contract. 11 Fletcher Cyclopedia Corporations (Perm.Ed.) § 5294. There is no ambiguity in these documents as there was in Moore v. American Finance & Securities Co., 31 Del.Ch. 335, 73 A.2d 47, and, thus, there is no room for interpretation.

■ If there were any doubt about the matter, it is resolved by the 1958 Agreement by which these plaintiffs acquired their Debentures and Certificates. By that Agreement, each preferred stockholder of Railroad received a Debenture, a Certificate, and a share of common stock for each of his preferred shares. The share of common stock was expressly stated to be for the purpose of preserving the preferred stockholder's right to vote, thus preserving his stockholder status. The Debenture and Certificate were given to get rid of the accumulated arrearages on the preferred stock. The arrearage was a corporate debt which was eliminated by the substitution of a contingency obligation assumed by Railroad. It is plain that Debenture and Certificate holders were intended to be creditors.

Having determined that they are creditors, the question is, Were their rights as creditors impaired by the exchange? It is plain, we think, that no contractual right of the Debenture and Certificate holders has been impaired. Both classes, prior to the exchange, had the right to be preferred over the common stock in the event of bankruptcy or liquidation. The

exchange is neither a bankruptcy or liquidation and their contractual right remains as it was before.

The Debenture and Certificate holders, prior to the exchange, had the right to be paid out of available income of Railroad before the payment of dividends on the common stock. This right is unimpaired by the exchange.

■ However, plaintiffs say that the exchange permits Industries to appropriate Railroad's non-transportation income which will have the effect of reducing the security of the Debentures and Certificates in bankruptcy or liquidation. It is obvious, however, that the exchange does not permit, and could not permit, the appropriation by Industries of any part of Railroad's income. Indeed, if the plaintiffs' fears materialize in the future, they have their remedy, but vague fears for the future are not actionable now.

■ Plaintiffs argue, apparently by analogy to the doctrine of corporate opportunity, that Industries may in the future acquire a non-transportation business which might otherwise have been acquired by Railroad. Assuming this to be the fact, these plaintiffs as creditors have no standing to complain on the theory that Industries had taken to itself Railroad's opportunity.

■ Furthermore, in order to invoke the rule of corporate opportunity, facts must be shown, *inter alia,* that the corporation from which the opportunity has been taken is financially able to undertake the opportunity. Equity Corporation v. Milton, 42 Del.Ch. 425, 221 A.2d 494. It is obvious from the record before us that Railroad is not now financially able to acquire any non-transportation enterprise, and has no prospect of becoming so in the foreseeable future.

■ Plaintiffs also argue that Industries may wrongfully appropriate Railroad's tax loss carryover to their detriment. However, the utilization by a parent of its subsidiary's tax loss carryover is not illegal absent "gross and palpable overreaching." Meyerson v. El Paso Natural Gas Company, Del.Ch., 246 A.2d 789. There is no showing in this record of overreaching. On the contrary, the record, we think, shows that the Exchange Plan is designed through diversification to obtain needed money for Railroad. If future developments demonstrate actual injury to plaintiffs, they have their remedy. Such injury, at present, however, is nothing more than surmise.

Finally, plaintiffs argue that the corporate veil should be pierced and the separate corporate entities of Railroad and Industries be disregarded. They, however, can point to no violation of Delaware law by the exchange. What was done was merely an exchange of the stock of the corporations on a share-for-share basis. This is a common and legal act under Delaware law.

■ When the act complained of is performed in accordance with law and causes no legal injury to a creditor of the corporation, it must be regarded as an independent and distinct act irrespective of any other provision of the General Corporation Law. Federal United Corporation v. Havender, 24 Del.Ch. 318, 11 A.2d 331; Hariton v. Arco Electronics, Inc., 41 Del.Ch. 74; 188 A.2d 123.

■ Under the circumstances, therefore, the separate corporate entities will not be disregarded and Industries beheld to have assumed the obligation of the Debentures and Certificates.

The foregoing conclusion makes it unnecessary to reach the question of the defense of laches which has been argued to us even though the question was not reached by the Vice Chancellor.

The judgment below is affirmed.