In re TRACE INTERNATIONAL
HOLDINGS, INC., et al.,
Debtors.

John S. Pereira, as Chapter 7 Trustee
of Trace International Holdings,
Inc., et al., Plaintiff,

v.

Dow Chemical Company, Defendant.

Bankruptcy Nos. 99–10425(SMB),
99–10426(SMB).
Adversary No. 01–2949.

United States Bankruptcy Court,
S.D. New York.

Dec. 31, 2002.

Jaspan Schlesinger Hoffman, LLP, Eugene P. Cimini, of Counsel, Garden City, NY, for Plaintiff.

Orrick, Herrington & Sutcliffe, LLP, James L. Stengel, Steven J. Fink, of Counsel, New York City, for Defendant.

## MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SANCTIONS

STUART M. BERNSTEIN, Chief Judge.

John S. Pereira, the chapter 7 trustee of the estate of Trace International Holdings,

Inc. ("Trace"), commenced this adversary proceeding under bankruptcy, New York and Delaware law to avoid and recover allegedly fraudulent transfers aggregating $3,575,150.00. The defendant Dow Chemical Company ("Dow") has moved for summary judgment dismissing the amended complaint in its entirety. For the reasons that follow, the Court grants summary judgment to the extent of dismissing the claims based upon actual fraudulent intent as well as all claims asserted under Delaware law. The balance of the motion is denied. In addition, Dow's separate motion for sanctions is denied.

### FACTS

The parties' dispute arises from a three party transaction pursuant to which Dow loaned money to BSI Acquisitions Corp. ("BSI"), and BSI used the loan proceeds to purchase preferred stock from Trace. In or about 1992, Trace had a controlling ownership interest in Foamex International, Inc. ("Foamex"). (*Declaration of Howard W. Burdett*, dated Aug. 12, 2002 (the "*Burdett Declaration*"), at ¶ 2.) Foamex, in turn, was a major customer of Dow's polyurethanes business. (*Burdett Declaration* ¶ 2; *Declaration of Dennis R. Campbell*, dated Aug. 14, 2002 ("*Campbell Declaration*"), at ¶ 2.)

#### A. The 1992 Transaction

In the spring of 1992, Dow agreed to fund the purchase of Trace stock for the purpose of enhancing its commercial relationship with Foamex. (*See Burdett Declaration* ¶ 3.) The consummation of the transaction involved several steps. To begin with, on March 5, 1992, Dow's Board of Directors resolved to lend Donaldson, Lufkin & Jenrette, Inc. ("DLJ") $20 million.

(*See Declaration of Steven J. Fink In Support of Defendant The Dow Chemical Company's Motion For Summary Judgment*, dated Aug. 15, 2002 ("*Fink Declaration*"), Ex. 1, Tab 27) (Certificate of Assistant Secretary of Dow, dated May 1, 1992, attaching the relevant resolution.) Dow actually made the loan to BSI [1] (the "Dow/BSI Loan") on or about May 1, 1992. The loan bore interest at the annual rate of 7%, or $1.4 million, payable quarterly, (*Burdett Declaration*, Ex. 2, ¶ 3), and the balance was due five years later. (*Id.* ¶ 7 & Ex. 2, ¶ 2.)

As part of the same transaction, Trace sold 1000 shares of Trace Series A Preferred Stock (the "Preferred Stock") to BSI for $20 million, (*see Fink Declaration*, Ex. 1, Tab 5 (Series A Preferred Stock Purchase Agreement, dated as of May 1, 1992)), which BSI promptly pledged to Dow as security for its $20 million debt. (*Id.*, Ex. 1, Tab 8 (Stock Pledge Agreement, dated May 1, 1992).) The Preferred Stock accrued dividends, which were payable quarterly "out of any funds legally available," at the annual rate of $1,400.00 per share, or $1.4 million. (*Id.*, Ex. 1, Tab 1, ¶ 3(i).) Thus, the dividends precisely matched the amounts and payment dates of the interest due under the Dow/BSI Loan Agreement.

The annual dividend rate remained in effect for five years, until the Dow/BSI Loan matured. Thereafter, the annual per share dividend rate increased to $20,000.00, multiplied by the three month United States Treasury Bill rate plus 6%. (*Id.*) If Trace exercised its right to redeem the Preferred Stock, the per share price would be $20,000.00 (or an aggregate of $20 million) plus the accrued but unpaid

---

**1.** It appears that BSI was a special purpose entity created by DLJ for the purpose of the transaction.

dividends. (*See Id.*, Ex. 1, Tab 1, ¶¶ 4(i), 5(ii).)

As part of the same transaction, Trace loaned $10 million to Dow (*i.e.*, "purchased" a $10 million Dow Note.) (*See id.*, Ex. 1, Tab 14.) Absent a specified decline in Dow's credit rating, the Dow Note was also due in five years. The Dow Note accrued interest at a rate keyed to the rate of three-month commercial paper. (*Id.*) Trace, in turn, guaranteed up to $10 million of BSI's debt to Dow, (*id.*, Ex. 1, Tab 12), and pledged the Dow Note as collateral for its guarantee. (*Burdett Declaration*, Ex. 4.)

Finally, the parties established an escrow arrangement to hold the pledged documents and to receive and disburse payments. Pursuant to an Escrow and Collateral Trust Agreement between Dow, Trace and BSI, dated as of May 1, 1992 (the "Escrow Agreement"), (*see Burdett Declaration*, Ex. 3), BSI delivered the pledged shares and Trace delivered the pledged Dow Note to Citibank, N.A., as escrow agent, to hold in trust for the benefit of Dow. (*See id.*, Ex. 3, ¶ 2.) The Escrow Agreement required Trace to pay the Preferred Stock dividends to the escrow agent for the benefit of BSI, (*id.*, Ex. 3, ¶ 3(a)), and "[p]romptly upon receipt," the escrow agent was required to deliver the dividend payments to Dow in satisfaction of BSI's obligations under the Dow/BSI Loan Agreement. (*Id.*, Ex. 3, ¶ 5(a).) In addition, Dow made all of the Dow Note payments to the escrow agent for the benefit of Trace. (*Id.*, Ex. 3, ¶ 3(b).)

The net effect of all of these transactions on the parties is much simpler to state. Dow loaned $10 million at an annual return of $1.4 million, and Trace received $10 million at an annual cost of $1.4 million.

In addition, Trace earned interest on the Dow Note.

## B. The 1995 Recapitalization

On or about May 19, 1995, Dow, Trace and BSI entered into a Master Recapitalization Agreement, (*see Fink Declaration*, Ex. 2), for the purpose of modifying their respective rights and obligations. Pursuant to the Master Recapitalization Agreement, inter alia:

1. Dow paid Trace the $10 million balance on the Dow Note;

2. Trace, in turn, paid BSI $10 million in consideration for BSI's consent, *inter alia*, to halve the per share annual dividend from $1,400.00 to $700.00 from the date of the modification through May 1, 1997. After May 1, 1997, the annual dividend rate was to be "equal to (i) the amount of $10,000 per share per annum [rather than $20,000, as provided in the original Certificate of Designations] multiplied by [the then-current interest rate on three-month Treasury Bills] plus six percent per annum." (*See Fink Declaration*, Ex. 2 (Annex A to the Certificate of Fourth Amendment));

3. BSI used the $10 million to repay part of the outstanding balance of the Dow/BSI Loan. (*See id.*, Ex. 2, ¶¶ 1.1–1.5); and

4. The Trace guarantee terminated.[2] (*Id.*, ¶ 1.5.)

The changes under the 1995 recapitalization were consistent with the repayment of 50% of the Dow/BSI Loan. The repayment reduced BSI's interest obligation and outstanding balance owed to Dow by 50%, and also reduced Trace's corresponding Preferred Stock annual dividend obligation

---

2. The pledge of the Dow Note was also terminated, (*see Fink Declaration*, Ex. 2, ¶ 1.5), but would be worthless in any event because the Dow Note had been satisfied.

and redemption price by 50%. The one fact that did not change was the number of outstanding shares of Preferred Stock. Thus, the redemption price and dividend rate for the Preferred Stock had nothing to do with the value of the Preferred Stock and everything to do with the outstanding balance of the Dow/BSI Loan.

## C. The Transfers

The trustee's Amended Complaint, dated February 25, 2002, alleged that Trace transferred $367,325.00 to Dow within one year of the July 21, 1999 petition date. (Amended Complaint ¶ 20.) It further alleged that Trace transferred $3,575,150.00 to Dow between January 1, 1995 and the petition date. (*Id.* ¶ 29.) The specific transfers were identified in the *Plaintiff's Automatic Discovery Pursuant to Fed. R.Civ.P. 26(a)(1)*, dated Jan. 14, 2002. (*See Fink Declaration*, Ex. 7.) The submission attached a schedule and documents indicating that Trace made the following dividend payments, by wire transfer, to Dow between January 31, 1997 and the petition date:

| Date of Transfer | Amount of Transfer |
| --- | --- |
| 01/31/97 | 175,000.00 |
| 05/01/97 | 175,000.00 |
| 08/01/97 | 278,000.00 |
| 10/31/97 | 274,250.00 |
| 01/30/98 | 276,750.00 |
| 05/01/98 | 273,500.00 |
| 07/31/98 | 191,100.00 |
| 10/30/98 | 176,225.00 |
| | 1,819,825.00 |

Although the schedule identified Dow as the "Payee," the attached wire transfer records indicated that the payments were actually made to the escrow agent, presumably in accordance with the parties' Escrow Agreement.[3] BSI, in this regard, was always the record owner of the Preferred Stock. (*Fink Declaration*, Ex. 6 (*Plaintiff's Response to Defendant's Request for Admissions*, dated June 21, 2002), Response No. 6.) In addition, the trustee conceded that the payments were made to BSI although he maintained that BSI was acting as Dow's agent. (*Id.*, Ex. 6, Response No. 7.)

It appears that the last two entries in the table correspond to the payments made to the escrow agent on account of the Preferred Stock dividends within one year of the petition. The remaining scheduled payments were made under the same arrangement between January 1, 1997 and one year before the petition date. I assume that the difference between the aggregate scheduled payments ($1,819,825.00) and the total sought in the amended complaint ($3,575,150.00), *i.e.*, $1,755,325.00, equals the amount of dividend payments made between January 1, 1995, and January 1, 1997.[4]

If Trace was in dire financial straits at the time it made the dividend payments, Dow was unaware of it. Dow monitored and had access to information regarding Foamex's financial condition as a result of its commercial relationship with Foamex and Foamex's status as a publicly held company. (*Declaration of David E. Chamberlain*, dated Aug. 14, 2002 (the "*Chamberlain Declaration*"), at ¶ 3; *Campbell Declaration* ¶ 5). Trace, however, was privately held, and did not have a

---

**3.** I assume that the escrow agent paid the dividends to Dow in satisfaction of BSI's interest obligation. Dow has never denied receiving the payments.

**4.** This assumption is buttressed by a comparison of the original complaint and the Amended Complaint. The Amended Complaint extended the pre-petition reach back period from January 1, 1997 to January 1, 1995, and increased the total damage claim from $1,819,825.00 to $3,575,150.00.

commercial relationship with Dow. (*Chamberlain Declaration* ¶ 3; *Campbell Declaration* ¶ 5).

## D. This Motion

The Amended Complaint asserted four causes of action predicated on the fraudulent nature of the transfers. The first and second causes of action were brought under §§ 548 and 550 of the Bankruptcy Code, and sought to avoid and recover $367,325.00—the value of the transfers made within the one year period preceding the filing of the petition. They were based, respectively, on theories of constructive and actual fraud. The third cause of action was asserted under §§ 544(b) and 550 of the Bankruptcy Code and the N.Y. DEBT. & CRED. §§ 270, *et seq.*, (McKinney 1990 & 2002 Supp.). It sought to avoid and recover $3,575,150.00, the total amount transferred since January 1, 1995. The fourth caused of action asserted the same claims under Delaware law.

Dow moved for summary judgment on several grounds. First, the trustee could not prove actual fraudulent intent because all of the payments were made in connection with legitimate business transactions. Second, the trustee had already conceded that the payments at issue were made on account of "antecedent debts," and consequently, he could not prevail on his constructive fraudulent transfer claims. Third, Dow was not the initial transferee, and received the transfer from BSI in good faith, for value, and without knowledge of the voidability of the transfer. Fourth, the claim based on Delaware law should be dismissed because Delaware law is inapplicable. In any event, "the relevant provisions of the Delaware Code do not vary in any material respect from those of the Bankruptcy Code and the New York [Debtor & Creditor Law]." (*Memorandum of Law in Support of De-*

*fendant The Dow Chemical Company's Motion for Summary Judgment,* dated Aug. 15, 2002 ("*Dow Memorandum*"), at 26.) Hence, it should be dismissed along with the other three claims.

The trustee's opposition focused primarily on Dow's second point. He disputed that he ever conceded that the dividends were antecedent debts. (*See Memorandum of Law In Opposition to the Dow Chemical Company's Motion for Summary Judgment,* dated Sept. 20, 2002, at 4–9.) The trustee also recounted the standards that govern summary judgment motions, (*id.* at 9–11), and concluded:

> In the instant action, viewed in the light of what is *most* favorable to *Dow,* there are still substantial issues of fact as to whether the conveyances at issue are avoidable as fraudulent conveyances.

(*Id.* at 10–11)(emphasis in original.) He did not submit additional evidence in connection with the motion, or argue that he required discovery in order to meet the motion.

## DISCUSSION

### A. The Standard Governing Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Fed. R. Bankr.P. 7056, governs summary judgment motions. A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party bears the initial burden of showing that the undisputed facts entitle him to judgment as a matter of law. *Rodriguez v. City of New York,* 72 F.3d 1051, 1060–61 (2d Cir.1995). If the movant carries this initial burden,

the nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials. Fed.R.Civ.P. 56(e). *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether material factual issues exist, all ambiguities must be resolved and all inferences must be drawn in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587, 106 S.Ct. 1348.

## B. Choice of Applicable State Law

■ The trustee has asserted fraudulent transfer claims under the Bankruptcy Code and both Delaware and New York law. Dow argues that New York law should govern the state law claims. It reasons that the trustee's fraudulent transfer claims sound in tort, and New York had the most significant contacts. (*Dow Memorandum*, at 25–26.) The trustee did not respond to Dow's argument.

I take the trustee's silence as his consent to the application of New York law.

*Cf. Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir.2000)(if both sides treat New York law as controlling in their memoranda, this is sufficient to establish New York as the governing law). In any event, New York has significant contacts with this dispute. Trace maintained its principal place of business in New York, and made the payments at issue through a New York escrow account. Finally, Dow argues, and the trustee again does not dispute, that the fraudulent transfer laws of Delaware and New York will lead to the same outcome. (*Dow Memorandum*, at 26.) Hence, there is no actual conflict.[5]

## C. Dow is the Initial Transferee

■ Section 548 of the Bankruptcy Code permits the trustee to recover any actual or constructive fraudulent transfers made within one year of the petition date.[6] Under § 544(b), the trustee may, in most cases, also use the provisions of state law governing the recovery of fraudulent transfers by creditors.[7] As noted, New York law is the applicable state law.

If the trustee proves a fraudulent transfer claim, he can then recover the value of

---

**5.** Delaware has adopted the Uniform Fraudulent Transfer Act which is based on the Bankruptcy Code. *See* UNIF. FRAUDULENT TRANSFER ACT, 7A U.L.A. 269–71 (1999)(Prefatory Note). Not surprisingly, Delaware fraudulent transfer law is virtually a carbon copy of the fraudulent transfer law under the Bankruptcy Code. Consequently, the result under Delaware law should be the same as the outcome under the Bankruptcy Code.

**6.** Section 548(a) provides, in pertinent part:
(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such

transfer was made or such obligation was incurred, indebted; or
(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

**7.** Section 544(b)(1) states:
Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation

the transfer from the transferee or from any subsequent transferees unless the subsequent transferee received the transfer in good faith, for value and without knowledge of the voidability of the transfer.[8] Dow contends that it is the transferee of BSI and the subsequent transferee of Trace. However, its argument lacks merit.

Although Trace made the dividend payments to the escrow agent for the benefit of BSI, BSI never had control over the dividend payments or the right to use them. Instead, the Escrow Agreement directed the escrow agent to remit the payments to Dow on account of BSI's obligations under the Dow/BSI Loan Agreement. Consequently, Dow was the initial transferee of the Trace payments. *See Christy v. Alexander & Alexander of New York, Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 59 (2d Cir.1997) (insurance broker who received premiums from debtor and passed them along to insurer in the ordinary course of business and consistent with its contractual undertaking is not the "initial transferee").

### D. The Trustee's Actual Fraudulent Transfer Claims

Both the Bankruptcy Code and New York law permit the trustee to recover a transfer made or obligation incurred with the actual intent to hinder, delay or defraud a creditor. 11 U.S.C. § 548(a)(1)(a); N.Y DEBT. & CRED. LAW § 276 (McKinney 1990)("NYDCL"). Dow's submissions show, however, that the payments at issue were made in connection with a legitimate business transaction that had been entered into several years earlier. Further, Dow lacked any knowledge of Trace's financial condition. The trustee failed to adduce evidence from which fraudulent intent could be inferred, and accordingly, Dow is entitled to summary judgment dismissing the actual fraudulent transfer claims.

### E. The Trustee's Constructive Fraudulent Transfer Claims

The trustee also alleges claims sounding in constructive fraudulent transfer. A constructive fraudulent transfer does not involve actual fraud. Instead, it focuses on the adequacy of the consideration received in exchange for the transfer and the effect of the transfer on the transferor's financial condition. *See Nisselson v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.)*, 222 B.R. 417, 428–29 (Bankr.S.D.N.Y.1998). Under 11 U.S.C. § 548, the trustee must demonstrate that within one year of the petition

---

incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

8. Section 550 provides, in pertinent part, as follows:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

date, (1) the debtor transferred an interest in property; (2) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer, and (3) the debtor received "less than a reasonably equivalent value in exchange for such transfer." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994)(quoting § 548(a)(1)(B)).

▮ New York law is based on the older Uniform Fraudulent Conveyance Act, and uses different terminology. Under NYDCL § 273, "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the consideration is made or the obligation is incurred without a fair consideration." To satisfy the New York test, the transferee must convey property or discharge an antecedent debt of equivalent value. In addition, the transferee must make the exchange in good faith. *Lawson v. Barden (In re Skalski)*, 257 B.R. 707, 711 (Bankr. W.D.N.Y.2001). "Good faith" is not a requirement for "reasonably equivalent value" under the Bankruptcy Code and the Uniform Fraudulent Transfer Act. *See*

UNIF. FRAUDULENT TRANSFER ACT, 7A U.L.A. 269–70 (1999)(Prefatory Note).

▮ Here, the parties do not dispute that Trace transferred an interest in property when it paid the dividends to the escrow agent. Trace's solvency, on the other hand, is hotly disputed, and cannot be resolved as a matter of law.[9] Dow nevertheless argues that it is entitled to summary judgment because the debtor received "reasonably equivalent value" for the payments at issue, to wit, the satisfaction of antecedent debts. Hence, the trustee cannot prove the third element of his claim.

The strength of Dow's contention appears to turn on whether Trace's payments are considered to be dividends or interest. Trace is a Delaware corporation, and the proper characterization of the payments requires the consideration of Delaware law. Under section 170(a) of Delaware's General Corporation Law ("DGCL"), DEL. CODE ANN., tit. 8, § 170(a)(2002 Supp.), a corporation may pay dividends out of "surplus," or if there is no "surplus," "out of the net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year."[10] "Surplus" is the amount that the

---

9. "Solvency" is used as a shorthand method to refer to the different financial tests under bankruptcy and New York fraudulent transfer law.

10. DGCL § 170 states:
    (a) The directors of every corporation, subject to any restrictions contained in its certificate of incorporation, may declare and pay dividends upon the shares of its capital stock, or to its members if the corporation is a *nonstock corporation*, either (1) *out of its* surplus, as defined in and computed in accordance with §§ 154 and 244 of this title, or (2) in case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year. If the capital of the corporation, computed in accordance with §§ 154 and 244 of this title, shall have been diminished by

depreciation in the value of its property, or by losses, or otherwise, to an amount less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets, the directors of such corporation shall not declare and pay out of such net profits any dividends upon any shares of any classes of its capital stock until the deficiency in the amount of capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets shall have been repaired. Nothing in this subsection shall invalidate or otherwise affect a note, debenture or other obligation of the corporation paid by it as a dividend on shares of its stock, or any payment made thereon, if at the time such note, debenture or obligation was delivered by the corporation, the corporation had either surplus or net

net assets exceed the capital, and "net assets" means the amount that total assets exceed total liabilities. DGCL § 154.

■ Generally, an insolvent Delaware corporation cannot pay dividends. *EBS Litig. LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302, 305 (3rd Cir.2002). The unlawful dividend is voidable, *EBS Litig. LLC*, 304 F.3d at 305, and may be recovered by the trustee as a fraudulent transfer. *See Official Comm. Of Unsecured Creditors of Color Tile, Inc. v. Blackstone Family Inv. P'ship (In re Color Tile, Inc.)*, No. 96–76, 2000 WL 152129, at *3 (D.Del. Feb.9,2000); *accord Mancuso v. Champion (In re Dondi Fin. Corp.)*, 119 B.R. 106, 113 (Bankr.N.D.Tex.1990)(decided under the Texas Uniform Fraudulent Conveyance Act). Thus, if Trace was insolvent, as I must assume it was in deciding this motion, it could not pay a dividend to Dow. If, however, Dow was a lender rather than a shareholder and the payments are considered interest, they would qualify as antecedent debts and escape avoidance.[11]

■ The correct characterization of interest held by Dow and the payments made by Trace is not a straightforward task. The Dow/BSI portion of the transaction resembled a loan, and the BSI/Trace part looked like a preferred stock transaction. While the labels that the parties give to their deal may offer some direction, the nature of the transaction is determined by its economic substance. *See* 11 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5291, at 566–67 (1995 rev. vol.)("FLETCHER"). *Color Tile*, a Delaware case with analogous facts, demonstrates this principle.

There, the debtor issued preferred stock, and subsequently declared and paid in excess of $10 million in dividends to the preferred stockholders. Following bankruptcy, the Official Committee of Unsecured Creditors commenced an adversary proceeding to recover the dividends under Delaware and bankruptcy fraudulent transfer law. 2000 WL 152129, at *1. The transferees responded that the their purchase of the preferred stock was tantamount to a loan, and accordingly, the dividends were payments in satisfaction of an antecedent debt. *Id.* at *4.

The district court began its analysis with a recitation of the factors relevant to a determination of the inquiry:

---

profits as provided in clause (1) or (2) of this subsection from which the dividend could lawfully have been paid.

(b) Subject to any restrictions contained in its certificate of incorporation, the directors of any corporation engaged in the exploitation of wasting assets (including but not limited to a corporation engaged in the exploitation of natural resources or other wasting assets, including patents, or engaged primarily in the liquidation of specific assets) may determine the net profits derived from the exploitation of such wasting assets or the net proceeds derived from such liquidation without taking into consideration the depletion of such assets resulting from lapse of time, consumption, liquidation or exploitation of such assets.

11. Given the different financial tests, it is possible that a corporation that is insolvent under the fraudulent conveyance laws can nonetheless pay a "lawful" dividend. *See Color Tile*, 2000 WL 152129, at * 3. This possibility can lead to an odd result. Under Delaware law, a dividend lawfully declared creates a contract debt. *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1175 (Del.1988). If the debt satisfies the definition of an "antecedent debt" under the fraudulent transfer laws, it may qualify as a complete defense to the avoidance and recovery of the fraudulent transfer. *Cf. Color Tile*, 2000 WL 152129, at *5 (if the dividend is unlawful, it does not give rise to a valid obligation or qualify as an "antecedent debt" within the meaning of fraudulent conveyance law).

Whether a security constitutes equity or debt depends on the interpretation of the contract between the corporation and the security holders. *See Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 75 (Del.1969); *accord Drexler, supra*, at 17–5 n. 8. In interpreting the contract, courts consider numerous factors, including: (1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors; and (7) certainty of payment in the event of the corporation's insolvency or liquidation.

*Id.; accord Moore v. American Fin. & Sec. Co.*, 73 A.2d 47, 47–48 (Del.Ch.1950); *see generally* 11 FLETCHER § 5291, at 567–68. Applying these factors, the *Color Tile* court had "little doubt" that the parties had intended an equity interest. The transaction documents referred to the defendant's interests as preferred stock. Although dividend and redemption dates were projected, the debtor's ability to pay dividends was limited to "funds legally available therefor," and the ability to redeem the stock was restricted based upon the debtor's substantially leveraged financial condition. Finally, in the event of a liquidation, the payment of accrued dividends and the redemption price were subordinated to creditors in a liquidation. *Id.* at *4–5. "Where such certainty of payment is missing, the security is equity, not debt." *Id.* at *5.

The application of the factors in this case is more difficult because of the bifurcated nature of the transaction. Nevertheless, the economic substance of the transaction suggests that Dow owned an equity interest rather than a debt obligation. It is true that Dow had an abso-

lute right to the payment of interest and principal from BSI under the Dow/BSI Loan. The submissions implied, however, that BSI lacked the means to pay Dow except with the funds it received from Trace.

As a practical matter, therefore, Dow's actual rights against BSI were no greater than BSI's legal rights against Trace as owner of the Preferred Stock. As stated earlier, Trace could not pay dividends to the escrow agent on BSI's behalf unless it was solvent. Similarly, Delaware law prevented Trace from redeeming the Preferred Stock if its capital was impaired or would be become impaired by the redemption. DGCL § 160(1). Finally, in the event of a liquidation, the Preferred Stock was entitled to payment "out of the assets of the Corporation available for distribution to its stockholders." (*Fink Declaration*, Ex. 1, Tab 1, ¶ 4(i).) In short, Dow expected to receive no more than BSI.

In addition, although BSI was obligated to satisfy the outstanding balance of the Dow/BSI Loan by May 1, 1997, Trace was not required to redeem the Preferred Stock by any outside date. While the evidence indicated that it made business sense to redeem the Preferred Stock by May 1, 1997, (*Affidavit [of Thomas M. Blake] in Opposition to Defendant's Motion for Summary Judgment*, sworn to Sept. 18, 2002 ("*Blake Affidavit*"), at ¶ 6), Trace's ability to redeem still depended on solvency, and the solvency requirement indicates that Dow held a shareholder's interest. *See Color Tile*, 2000 WL 152129, at *4; *In re Revco D.S., Inc.*, 118 B.R. 468, 474 (Bankr.N.D.Ohio 1990)(mandatory preferred stock redemption provision dependent on issuer's solvency did not make preferred shareholder a "creditor").

Accordingly, the economic substance of the transaction resembled a stock pur-

chase by Dow from Trace. The record did not, however, include direct evidence of the parties' intent, and that evidence may affect my ultimate determination. Nevertheless, Dow is plainly not entitled to partial summary judgment declaring that the transfers were made on account of antecedent debts.

■ This conclusion necessarily rejects Dow's argument that the trustee should be barred as a matter of law from maintaining that Dow received dividends rather than debt payments. In support, Dow points primarily to the position taken by the trustee in his district court action against the former officers and directors. There, as here, the trustee averred that Trace was insolvent during the last half of the 1990s, the same period that the transfers at issue were made. (*See Fink Declaration*, Ex. 9, ¶ 7.) The trustee's expert in that action (who is also his expert in this adversary proceeding) performed a quarterly valuation analysis of Trace based upon what a hypothetical buyer would be willing to pay for the company. He treated the redemption of the Preferred Stock as a "cash obligation," (*Blake Affidavit*, Ex. A, at 14; *accord Fink Declaration*, Ex. 4 (Transcript of deposition of Thomas M. Blake, held Mar. 19, 2002), at 118–24), and concluded that a hypothetical buyer would insist on deducting these potential cash obligations from the purchase price. (*See Blake Affidavit* ¶ 6.) Consistent with his conclusion, he deducted the redemption obligation from Trace's assets in computing Trace's fair market value, (*see Blake Affidavit*, Ex. A, Ex. 1), and treated it as cash outflow in computing the cash flow

and capital adequacy of Trace over time.[12] (*See id.*, Ex. 2.)

While the trustee has attempted to draw a distinction between a liability and an obligation, his positions appear to be contradictory. To prevail on his constructive fraudulent transfer claims, the trustee must show, *inter alia*, that Trace was insolvent at the time of each transfer, and did not receive reasonably equivalent value (or fair consideration). Payment of an antecedent debt would constitute sufficient consideration, and defeat the trustee's claims. The trustee argues, in essence, that the redemption obligation, which included the payment of accrued dividends, should be treated as a liability in computing insolvency and a non-liability in determining the adequacy or fairness of the consideration provided by Dow.

■ The Preferred Stock obligations were one or the other, but probably not both. Ordinarily, a stock redemption obligation that is conditioned on the issuer's solvency is not considered a liability in determining the issuer's solvency. *See Brown v. Shell Canada, Ltd. (In re Tennessee Chemical Co.)*, 143 B.R. 468, 473 (Bankr.E.D.Tenn.1992), *aff'd in part & rev'd in part on other grounds*, 112 F.3d 234 (6th Cir.1997); *Joshua Slocum, Ltd. v. Boyle (In re Joshua Slocum, Ltd.)*, 103 B.R. 610, 622–24 (Bankr.E.D.Pa.), *aff'd*, 121 B.R. 442 (E.D.Pa.1989). If, on the other hand, the Preferred Stock obligations reduced Trace's fair market value dollar for dollar—as the trustee's expert opined—the payment of the obligation should increase Trace's fair market value dollar for dollar. In that event, it is not clear how the payment would injure the

---

12. In addition, the trustee admitted in this adversary proceeding that the issuance of the Preferred Stock gave rise to "cash obligation," and should have been recorded by Trace as a liability that Trace would be re-

quired in the future to satisfy with cash. (*Fink Declaration*, Ex. 6 (*Plaintiff's Response to Defendant's Request for Admissions*, dated June 21, 2002, Response nos. 10, 17, 18.))

creditors or be recoverable as a fraudulent transfer. *See Bear, Stearns Secs. Corp. v. Gredd,* 275 B.R. 190, 195 (S.D.N.Y.2002) ("creditors must actually be harmed in order to avoid a fraudulent transfer under [11 U.S.C. § 548]").

Nevertheless, the trustee should not be prevented, at this point, from contending that the payments to Dow were dividends. First, Dow has not pointed to any mandatory authority that forecloses the trustee's position. Second, Dow has conceded that judicial estoppel does not apply because no court has adopted the trustee's position that the Preferred Stock obligations are liabilities for valuation purposes. *See Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 3 (2d Cir.1999) ("a party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner"); *Bridgeway Corp.,* 201 F.3d at 141 (same). Dow's argument ignores the limitations on judicial estoppel, yet garners precisely the same benefits that the doctrine would afford. Third, the trustee may change his position, or in Dow's view, adopt a more consistent position at trial.

## F. Dow's Motion for Sanctions

Dow has made a separate motion for sanctions under Fed. R. Bankr.P. 9011 based upon the inconsistent position discussed immediately above. Rule 9011(b) states:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Dow contends that the trustee violated subparagraphs (b)(2) and (b)(3) "by continuing to prosecute his fraudulent conveyance claims against [Dow] after admitting that the underlying transaction was a loan entered into in 1992." (*Memorandum of Law in Support of Defendant [Dow's] Motion for Sanctions,* dated Aug. 15, 2002, at 12.)

Rule 9011 parallels Fed. R.Civ.P. 11, and the jurisprudence under Rule 11 informs the interpretation and application of Bankruptcy Rule 9011. *In re Highgate Equities, Ltd.,* 279 F.3d 148, 151 (2d Cir.2002). Rule 11 "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." FED. R. CIV. P. 11 advisory committee's note (1993); *accord Margo v. Weiss,* 213 F.3d 55, 64 (2d Cir.2000). The imposition of sanctions is discretionary, and "should only be imposed if 'it is patently clear that a claim has absolutely no chance of success,' and all doubts should be resolved in favor of the signing attorney." *K.M.B. Warehouse*

*Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 131 (2d Cir.1995)(quoting *Rodick v. City of Schenectady,* 1 F.3d 1341, 1350 (2d Cir.1993)).

 The motion must be denied. As discussed, Dow has failed to identify any mandatory authority that forecloses the trustee's argument, and while it appears that the trustee is taking inconsistent positions, I cannot conclude that he has "absolutely no chance of success." Moreover, the cases cited by Dow involved attempts to contradict prior sworn factual testimony under circumstances suggesting perjury or the utter disregard of obvious facts. *See Salovaara v. Eckert,* 222 F.3d 19, 33 (2d Cir.2000)(plaintiff provided inconsistent sworn testimony regarding his reliance on defendant's advice to sell an asset); *Margo v. Weiss,* 213 F.3d at 65(plaintiffs' counsel filed affidavits, delayed deposition *errata* sheets and supplemental interrogatory answers that contradicted plaintiffs' earlier deposition testimony and interrogatory answers regarding the date they discovered their cause of action); *Levine v. FDIC,* 2 F.3d 476, 479 (2d Cir.1993)(plaintiff's counsel filed amended pleading containing baseless factual allegations that contradicted the defendant's and the plaintiff's sworn testimony relating to the defendant's contacts with the forum state).[13] Here, neither the trustee nor his expert have given inconsistent factual statements. Rather, the inconsistency, if any, is far more subtle. It revolves around a far murkier legal question—can the Preferred Stock obligations be debt for insolvency purposes and equity for consideration purposes?

In conclusion, Dow is entitled to summary judgment dismissing the actual fraudulent transfer claims and the claims asserted under Delaware law. Its motion for summary judgment directed at the constructive fraudulent transfer claims under § 548 of the Bankruptcy Code and, through 11 U.S.C. § 544(b), New York law, are denied. Lastly, Dow's separate motion for sanctions is denied.

The parties are directed to settle separate orders relating to the summary judgment and sanction motions. Furthermore, the parties should contact chambers for the purpose of scheduling a pre-trial conference.

---

13. Dow's other case did not concern inconsistent statements or positions, and dealt with an improper effort to invoke federal court jurisdiction. *See International Shipping Co. v. Hydra Offshore, Inc.,* 875 F.2d 388, 392 (2d Cir.1989).