# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD F. BURKHART, WILLIAM E. KELLY, RICHARD S. LAVERY, THOMAS R. PRATT, and GERALD GREEN, individually and on behalf of all other persons similarly situated, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **C.A. No. 2018-0691-JRS** |
| GENWORTH FINANCIAL, INC., GENWORTH HOLDINGS, INC., GENWORTH NORTH AMERICA CORPORATION, GENWORTH FINANCIAL INTERNATIONAL HOLDINGS, LLC and GENWORTH LIFE INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION

Date Submitted: January 28, 2022
Date Decided: May 10, 2022

Peter B. Andrews, Esquire, Craig J. Springer, Esquire and David M. Sborz, Esquire of Andrews & Springer LLC, Wilmington, Delaware and Edward F. Haber, Esquire, Michelle H. Blauner, Esquire, Thomas V. Urmy, Jr., Esquire and Patrick J. Vallely, Esquire of Shapiro Haber & Urmy LLP, Boston, Massachusetts, Attorneys for Plaintiffs.

Daniel A. Dreisbach, Esquire, Srinivas Raju, Esquire and Angela Lam, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Reid L. Ashinoff, Esquire, Kenneth J. Pfaehler, Esquire and Carter White, Esquire of Dentons US LLP, New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

Defendant, Genworth Life Insurance Company ("GLIC"), among other insurance products, writes a line of long-term care ("LTC") insurance policies that provide coverage for the notoriously costly burden of funding LTC expenses. Plaintiffs, a putative class of GLIC LTC policyholders and GLIC insurance agents who sold LTC policies for deferred commissions, allege that GLIC's corporate parent, Genworth Financial, Inc. ("Genworth"), and certain of its subsidiaries, fraudulently removed assets and capital support from GLIC when it became clear that the LTC insurance line was unprofitable. It is alleged that these fraudulent transfers have jeopardized GLIC's ability to pay LTC claims to its policyholders and LTC commissions to its insurance agents. Invoking Delaware's Uniform Fraudulent Transfer Act ("DUFTA"),[1] Plaintiffs ask the Court to unwind these transactions and restore GLIC to its previous state of solvency.

Plaintiffs' claims as initially pled survived a pleadings stage dismissal bid. In that motion, Defendants maintained that Plaintiffs lacked standing to challenge the allegedly fraudulent transfers since none of the putative class members had actually been denied LTC coverage or commissions on sales of LTC policies.[2]

---

[1] 6 *Del. C.* §§ 1301–1311.

[2] LTC policyholders typically acquire their insurance years before they require LTC with the expectation that coverage will be available when that time comes. As discussed below, the class members who hold LTC policies maintain that the fraudulent transfers have rendered GLIC unable to honor its coverage obligations when their claims become due. The class members who are GLIC insurance agents allege that GLIC will be unable to pay

The Court rejected that argument and held that Plaintiffs had standing under DUFTA as "contingent creditors," but dismissed some of Plaintiffs' claims as time-barred under the applicable statute of limitations.[3]

Having failed to attain dismissal, Defendants allegedly orchestrated a series of transactions to divert assets from the transferees of the initial allegedly fraudulent transfers. By Plaintiffs' lights, these transactions were intended to limit or eliminate the class's ability to secure remedies for the initial fraudulent transfers. Specifically, Plaintiffs allege that a Genworth subsidiary, Genworth Financial International Holdings, LLC ("GFIH"), an alleged transferee of the initial fraudulent transfer, sold its interests in valuable international subsidiaries, which comprised a substantial portion of its holdings. Those proceeds moved up the corporate chain and were ultimately distributed to affiliates as dividends. Plaintiffs amended their complaint to add three new claims challenging the distribution of these proceeds as intentional and constructive fraudulent transfers.

Defendants have moved to dismiss the new claims on two grounds. First, they argue Plaintiffs have not asserted viable claims under DUFTA because Plaintiffs and GFIH do not have the predicate creditor/debtor relationship necessary for DUFTA

---

deferred commissions owed on sales of LTC policies when those commissions become due.

[3] *Burkhart v. Genworth Fin., Inc.*, 250 A.3d 842 (Del. Ch. 2020) ("*Burkhart I*").

to apply. To the extent Plaintiffs are creditors (or contingent creditors) of any Defendant entity, say Defendants, they are contingent creditors of GLIC based only on the underlying LTC policies (as policyholders entitled to coverage or insurance agents entitled to commissions). In this regard, Defendants argue that Plaintiffs cannot use their DUFTA claims against GFIH (as transferee of alleged fraudulent transfers) to establish the debtor/creditor relationship because DUFTA, as a matter of law, does not bestow creditor status to the DUFTA plaintiff. According to Defendants, DUFTA codifies remedies; it does not codify substantive claims that, when proven and rendered to judgment, create judgment creditor standing. Second, even assuming Plaintiffs could have creditor standing under DUFTA for purposes of the new claims, because Plaintiffs seek only the remedies of unwinding certain transactions and restoring others, as opposed to a payment of what is (or potentially could be) owed them, their new DUFTA claims fail because they are not, in fact, "claims" under the statute, defined in part as a "right to payment." Without a "claim" that fits the statutory definition, say Defendants, Plaintiffs are not "creditors" under DUFTA and cannot, therefore, invoke that statute for redress with respect to their newly asserted claims.

The parties have found no Delaware authority that directly addresses Defendants' first argument, and the Court's search has fared no better. Courts in other jurisdictions, interpreting similar statutes, have held that a plaintiff must have

3

a right to payment independent of a right created by the state's uniform fraudulent transfer statute to qualify as "creditors" under the statute. But Plaintiffs have persuasively argued that a blanket holding to that effect would not capture the statute's nuance and would be in tension with official commentary to the uniform act explaining the statute's purpose and reach.

Defendants' second argument, however, has more purchase. In connection with their amended claims, Plaintiffs indisputably do not seek monetary damages or even an equitable "right to payment." Thus, the amended "claims" do not fit within the DUFTA's definition of a "claim" and, as such, Plaintiffs do not satisfy the statutory definition of "creditor" as required to have standing to pursue their amended claims under the statute. The partial motion to dismiss must be granted.

## I. BACKGROUND

I draw the facts from the allegations in the Second Amended and Supplemental Complaint (the "Complaint")[4] and documents incorporated by reference or integral to that pleading.[5] For purposes of this partial motion to dismiss,

---

[4] Second Am. and Suppl. Class Action Compl. ("SAC") (D.I. 132).

[5] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168–69 (Del. 2006); *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) ("On a motion to dismiss, the Court may consider documents that are 'integral' to the complaint . . . .").

I accept as true all well-pled factual allegations and draw all reasonable inferences in Plaintiffs' favor.[6]

To avoid needlessly repeating the extensive factual background of this case, I refer the reader to *Burkhart I.* Below I summarize only the facts pertinent to the motion *sub judice*.

## A. The Parties

Defendant, Genworth Financial, Inc. (as previously defined), sits atop the Genworth corporate tree and wholly owns Genworth Holdings, Inc. ("Holdings"), which, in turn, owns Genworth Financial International Holdings, LLC ("GFIH") and Genworth North America Corporation ("Genworth NA").[7] Genworth NA wholly owns Genworth Life Insurance Company ("GLIC").[8] GLIC is the LTC insurer that wrote the LTC policies at issue in this case.[9] GFIH owned interests in international subsidiaries that conduct mortgage insurance business in Canada and Australia that are implicated in the amended claims.[10] Counts V–VII of the Complaint are the

---

[6] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[7] SAC ¶¶ 7–10.

[8] SAC ¶¶ 9, 11.

[9] SAC ¶ 11.

[10] SAC ¶ 18.

claims at issue in this motion, and they are asserted only against Genworth, Holdings and GFIH.[11]

The following chart illustrates part of Genworth's organizational structure[12]:



Plaintiffs, Richard F. Burkhart, William E. Kelly, Richard S. Lavery, Thomas R. Pratt, and Gerald Green, are holders of LTC insurance policies issued by

---

[11] SAC ¶¶ 206–20.

[12] SAC ¶ 127 fig. 3.

GLIC or insurance agents entitled to commissions earned from selling GLIC policies.[13]   They assert claims on behalf of a putative class of GLIC LTC policyholders and insurance agents.

## B. The Motivation for the Alleged Fraudulent Transfers

As early as 2012, Genworth's management knew that GLIC's LTC business was sinking.[14]  To prevent the LTC business from destroying the overall share value of Genworth, Defendants "engaged in an intentional plan to syphon off GLIC's assets before it was too late" by removing assets and capital support from GLIC for the benefit of other Genworth subsidiaries.[15]  These transfers were intended to place assets beyond the reach of GLIC's policyholders and insurance agents when their claims for coverage or sales commissions came due.[16]

### 1. The Initial Claims

Plaintiffs' initial complaint asserted four counts against Defendants.  Counts I and II asserted intentional and constructive fraudulent transfer claims regarding what

---

[13] SAC ¶¶ 2–6.

[14] SAC ¶¶ 52, 116, 137, 139.

[15] *Burkhart I*, 250 A.3d at 846; SAC ¶¶ 132–39.  It appears this goal was openly acknowledged. *See, e.g.*, SAC ¶ 136 ("[W]e announced that one of our strategic objectives was to separate, then isolate, through a series of transactions, our long-term care insurance business from our other U.S. life insurance business.") (quoting from Genworth 10-K).

[16] SAC ¶¶ 17, 152–54, 167, 184–86.

Plaintiffs term the "GLIC Dividends." From 2012 to 2015, GLIC paid hundreds of millions of dollars as dividends to Genworth NA, Holdings and Genworth while intentionally concealing its inadequate capitalization and insolvency.[17]

Counts III and IV asserted intentional and constructive fraudulent transfer claims regarding the so-called "Reinsurance Termination." As illustrated in the organizational chart, Brookfield Life and Annuity Insurance Company Limited ("BLAIC") reinsured 50% of GLIC's LTC insurance obligations in order to spread risk.[18] In turn, GFIH entered into a capital maintenance agreement with BLAIC (the "Capital Maintenance Agreement"), under which GFIH agreed to back BLAIC's reinsurance obligations to GLIC.[19] GFIH owned valuable interests in Genworth's mortgage insurance businesses, so the Capital Maintenance Agreement functionally backstopped GLIC's obligations to policyholders with the value of the mortgage insurance assets.[20] Notably, GFIH was not required by contract to

---

[17] SAC ¶¶ 23, 58–59, 76.

[18] Originally, GLIC had a "quota share" agreement with an affiliated entity called Brookfield Life Assurance Co, Ltd. ("Brookfield"), in which GLIC retained 50% of the LTC premiums it received for the benefit of Brookfield, and in exchange, Brookfield agreed to pay 50% of the cost of claims. SAC ¶ 123. At the time, Brookfield's obligation was indirectly backed by Genworth's valuable Canadian and Australian mortgage insurance business. *See* SAC ¶ 127. Brookfield's obligations were later assumed by BLAIC. SAC ¶ 126.

[19] SAC ¶ 128.

[20] *Id.*

maintain a certain level or type of assets,[21] and in the Capital Maintenance Agreement, GFIH expressly disclaimed any contractual or other obligations to GLIC's policyholders or other persons.[22] Neither BLAIC's reinsurance agreement nor the Capital Maintenance Agreement restricted GFIH from selling its own subsidiaries or other assets, or from disposing of any related sale proceeds.[23]

On October 1, 2016, Genworth caused BLAIC to merge with and into GLIC, which had the effect of terminating BLAIC's reinsurance agreement with GLIC.[24] The parties then terminated the Capital Maintenance Agreement.[25] The combination of these two actions (together, the "Reinsurance Termination") cut off GLIC from the capital support of GFIH's assets.[26] Plaintiffs allege that the Reinsurance

---

[21] *See generally* Opening Br. in Supp. of Defs.' Mot. to Dismiss Counts V, VI and VII of the Second Am. Compl. ("DOB") (D.I. 142) Ex. 2.

[22] DOB Ex. 2 ¶ 4 ("[N]o policy holder or any other person or entity shall have any right to recover damages or other losses allegedly sustained as a result of GFIH's failure to comply with the provisions of this agreement, and (ii) this agreement is not, and nothing herein contained and nothing done pursuant hereto by GFIH shall be deemed to constitute, a guarantee, directly or indirectly, by GFIH of the payment of any claims pursuant to reinsurance policies issued by BLAIC."). Similarly, the reinsurance contract specifically stated that "[t]his Agreement shall not create any legal relationship whatsoever between Reinsurer and the persons who are either insured under the LTC Policies or reinsured under the Assumed Reinsurance Agreements." Ex. 1 at 3 § 2.1.

[23] *See* DOB Exs. 1–2.

[24] SAC ¶ 129.

[25] *Id.*

[26] SAC ¶ 130.

Termination was a fraudulent transfer because Defendants intentionally removed the support GLIC needed to pay future claims and commissions by engaging in the Reinsurance Termination without giving any consideration to GLIC.[27]

## 2. Motion Practice Related to the Initial Complaint

Defendants moved to dismiss Counts I–IV of the initial complaint on two theories.[28] First, they argued Plaintiffs lacked standing because they had not suffered (and have yet to suffer) an actual injury because GLIC has not defaulted on any obligations; Plaintiffs only "fear that GLIC may *someday* fail to pay their insurance claims or sales commissions."[29] Second, Defendants argued Plaintiffs' attempts to reverse some of GLIC's allegedly fraudulent dividends in Counts I and II were time-barred under DUFTA's statute of limitations.[30]

While the motion to dismiss was pending, Plaintiffs filed a motion for a status quo order.[31] Defendants entered into agreements to sell GFIH's shares in its valuable mortgage insurance companies and stated their intent to pay the proceeds as

---

[27] SAC ¶¶ 24, 129–32, 138.

[28] D.I. 9, 24; *Burkhart I*, 250 A.3d at 846.

[29] *Burkhart I*, 250 A.3d at 846.

[30] *Id.*

[31] D.I. 48.

dividends to Holdings.[32] Plaintiffs sought an order restraining GFIH from transferring proceeds of that sale so that, should they succeed in unwinding the Reinsurance Termination in Counts III and IV, GFIH would not be left without those valuable assets to support the reinsurance agreements Plaintiffs sought to have reinstated. Viewing the motion as essentially a motion for a preliminary injunction, the Court denied it as inadequately supported.[33]

On January 31, 2020, the Court denied the motion to dismiss the initial claims to the extent Defendants argued Plaintiffs lacked standing, holding that Plaintiffs have standing under DUFTA as contingent creditors of GLIC.[34] The Court held, however, that Plaintiffs' claims regarding the GLIC Dividends made from 2012 to 2014 were time-barred under DUFTA's statute of limitations.[35]

## C. The New Counts

On May 26, 2021, Plaintiffs filed the now-operative Complaint.[36] The Complaint added three new counts, Counts V–VII, against Genworth, Holdings

---

[32] Opening Br. in Supp. of Pls.' Mot. for a *Status Quo* Order (D.I. 48) at 3.

[33] D.I. 83. Specifically, the Court held, "I don't think the plaintiffs have shown a reasonable probability of success on the merits or that the balance of equities tips in favor of granting injunctive relief." D.I. 84 at 5:9–12.

[34] *Burkhart I*, 250 A.3d at 846, 852–57.

[35] *Id.* at 858–62.

[36] D.I. 132.

and GFIH.[37]  In these counts, Plaintiffs allege that Defendants' distribution of the sale proceeds from the Canada and Australian mortgage insurance assets was a fraudulent transfer under DUFTA because it was made "for the benefit of Genworth and Holdings" and for "no consideration."[38]  They seek avoidance of these dividends or other equitable relief because "[t]he Plaintiffs and the Class will be deprived of any meaningful relief in this action against GFIH [as transferee of the initial fraudulent transfers] unless the Canada/Australia [mortgage insurance] [t]ransfers are avoided or other relief is granted."[39]

## D. Procedural History

Defendants filed their partial motion to dismiss Counts V–VII on July 26, 2021.[40]  After briefing,[41] the Court held argument on December 7, 2021.[42]  The Court then requested supplemental briefing, which the parties submitted on January 28, 2022.[43]  The motion was deemed submitted on that date.

---

[37] SAC ¶¶ 206–20.

[38] SAC ¶ 167.

[39] SAC ¶ 219.

[40] D.I. 141.

[41] D.I. 142, 159, 163.

[42] D.I. 172.

[43] D.I. 188, 190.

## II. ANALYSIS

Counts V–VII of the Complaint assert fraudulent transfer claims against GFIH, Holdings and Genworth, and seek injunction orders that unwind the transfers of the Canada and Australian mortgage insurance assets and "[restore] to GFIH all of the value [allegedly] fraudulently transferred to Genworth and Holdings by means of the Canada/Australia MI Transfers."[44] By definition, "claims" under DUFTA are only available to "creditors," so Plaintiffs assert they are "contingent creditors" of GFIH based on their DUFTA claims asserted in Counts III and IV where they challenge the Reinsurance Termination.[45]

Defendants move to dismiss Counts V–VII, arguing Plaintiffs have failed to state a claim against GFIH because Plaintiffs are not "creditors" of GFIH (nor is GFIH Plaintiffs' "debtor") as defined under DUFTA. According to Defendants, possessing a claim under DUFTA "does not make one a creditor" as defined in the statute;[46] one must, instead, possess a "right to payment" separate from a right to pursue relief from a fraudulent transfer under DUFTA to have creditor standing

---

[44] SAC at 85 (Prayer); *see also* SAC ¶¶ 206–20.

[45] Opp'n to Defs.' Mot. to Dismiss Counts V, VI, and VII of the Second Am. Compl. ("PAB") (D.I. 159) at 12, 14, 17.

[46] DOB at 16 (quoting *In re Skinner*, 636 F. App'x 868, 870 (3d Cir. 2016)).

under the statute.[47]  Separately, Defendants argue that even if a DUFTA claim can be the basis of a subsequent DUFTA claim, Plaintiffs still cannot be deemed "creditors" because they do not (and cannot) seek a "right to payment," a prerequisite to creditor status under DUFTA.[48]  I address the arguments in turn after summarizing the standard of review.

## A. Standard of Review

The standard of review on a motion to dismiss under Court of Chancery Rule 12(b)(6) is well-established:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[49]

I accept as well-pled the allegations regarding the nature and intent of the transfers at issue here.  The issues framed for decision require me to determine whether these well-pled facts state a claim under DUFTA as a matter of law.  For the reasons explained below, I am persuaded they do not.

---

[47] Reply Br. in Supp. of Defs. Genworth Fin., Inc., Genworth Hldgs., Inc. and Genworth Fin. Int'l Hldgs., LLC's Mot. to Dismiss Counts V, VI and VII of the Second Am. Compl. ("DRB") (D.I. 163) at 10–13.

[48] DOB at 17; DRB at 6.

[49] *Savor*, 812 A.2d at 896–97.

## B. Counts V–VII Do Not State Viable DUFTA Claims

In 1984, the Uniform Law Commission enacted the Uniform Fraudulent Transfer Act ("UFTA") to reconcile the prior uniform law, the Uniform Fraudulent Conveyance Act ("UFCA"), with the updated language of the 1978 federal Bankruptcy Code.[50] As expressed in UFTA's official commentary, the purpose of the Act, like its predecessors, is to "[declare] rights and [provide] remedies for unsecured creditors against transfers that impede them in the collection of their claims."[51] As explained below, UFTA is generally considered a remedial statute meant to facilitate the collection of other existing claims.[52] Adopted by the Delaware

---

[50] David Gray Carlson, *Fraudulent Transfers: Void and Voidable*, 29 Am. Bankr. Inst. L. Rev. 1, 6 (2021); *see also* Peter A. Alces, *Law of Fraudulent Transactions* § 1.15 (Nov. 2021 Update) ("The UFTA was drafted to overcome shortcomings in existing fraudulent disposition law and to bring the state uniform enactments in line with the Federal Bankruptcy Reform Act of 1978.").

[51] Unif. Fraudulent Transfer Act § 1 cmt. 2 (Am. L. Inst. & Unif. L. Comm'n 1984).

[52] *See, e.g.*, *Hullett v. Cousin*, 63 P.3d 1029, 1034 (Ariz. 2003) ("[T]he UFTA is remedial; it does not create new claims."); *Deford v. Soo Line R. Co.*, 867 F.2d 1080, 1087 (8th Cir. 1989) ("The [UFTA] is not substantive in nature, but instead merely confers an alternate remedy for protecting preexisting creditor rights. . . . The purpose of the statute is to grant creditors additional enforcement possibilities when a debtor transfers his assets to a third party.") (emphasis added and citation omitted); *Fini v. J.W. Boudreau Corp.*, 18 N.E.3d 1135, 2014 WL 5150712, at *2 (Mass. App. Ct. 2014) (TABLE) ("As the language of the UFTA makes clear, an action for relief under [UFTA] depends upon the existence of an independently valid claim.") (citing *Kraft Power Corp. v. Merrill*, 981 N.E.2d 671, 681 (Mass. 2013)).

legislature in 1996, DUFTA is Delaware's version of the UFTA and its language is nearly identical to that of the uniform act.[53]

In 2014, the Uniform Law Commission updated its fraudulent conveyance statute for a second time and named the new law the Uniform Voidable Transaction Act ("UVTA"). Despite its new name, UVTA remained substantially similar to UFTA, with minor additions, style edits and changes to comments.[54]

DUFTA protects creditors from fraudulent transfers made by debtors. As explained in *Burkhart I*:

> The DUFTA protects a "creditor" from two types of fraudulent transfers. First, 6 *Del. C.* § 1304(a)(1) prohibits "transfer[s]" by debtors that are made "with actual intent to hinder, delay or defraud" ("actual fraudulent transfers"). Second, 6 *Del. C.* § 1304(a)(2) prohibits "transfer[s]" by debtors where the debtor (i) did not receive "reasonably equivalent value" and (ii) was rendered insolvent ("constructively fraudulent transfers").[55]

---

[53] S.B. 308, Delaware 138th Gen. Assemb., 2d Sess. (Del. 1996); *see also Ki-Poong Lee v. So*, 2016 WL 6806247, at *3 (Del. Super. Ct. Nov. 17, 2016) (observing that "Delaware has adopted the federal UFTA"); *In re Trace Int'l Hldgs., Inc.*, 287 B.R. 98, 105 n.5 (S.D.N.Y. 2002) ("Not surprisingly, Delaware's fraudulent transfer law is virtually a carbon copy of the fraudulent transfer law under the Bankruptcy Code.").

[54] *See* Unif. Voidable Transaction Act Prefatory Note (Am. L. Inst. & Unif. L. Comm'n 2014) ("The amendment project was instituted to address a small number of narrowly-defined issues, and was not a comprehensive revision."); *id.* (detailing the changes between UFTA and UVTA); *see also RPB SA v. Hyla, Inc.*, 2020 WL 6108210, at *9 (C.D. Cal. May 17, 2020) ("[T]he UFTA and UVTA are quite similar."); *Klein v. Armand*, 2021 WL 1647908, at *8 n.65 (D. Utah Apr. 27, 2021) ("The statutes are substantially similar . . . ."); *Kruse v. Repp*, 543 F. Supp. 3d. 654, 673 n.16 (S.D. Iowa 2021) (observing that the Iowa UVTA update "mostly reflected grammatical and stylistic alterations and is substantially similar to its predecessor in almost every regard").

[55] *Burkhart I*, 250 A.3d at 854.

Plaintiffs bring both actual (Count V) and constructive (Count VI) fraudulent transfer claims, as well as a related request for injunctive relief (Count VII).[56]

As noted, the thrust of Defendants' motion is that Plaintiffs have failed to state viable claims in Counts V–VII "because they are not creditors and the transfer [under challenge] was not made by their debtor," as defined in DUFTA.[57] Under DUFTA, "[a] transfer made or obligation incurred by *a debtor* is fraudulent as to *a creditor . . .* if the debtor made the transfer or incurred the obligation: (1) [w]ith actual intent to hinder, delay or defraud any creditor of the debtor; or (2) [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation," and was thereby rendered insolvent.[58] By its terms, DUFTA is inapplicable to non-creditors or non-debtors.[59]

---

[56] SAC ¶¶ 206–20. In their Complaint, Plaintiffs note that 6 *Del. C.* § 1307 "empowers the Court to grant such relief as equity may require." SAC ¶ 220. I address this more fully below.

[57] DOB at 13.

[58] 6 *Del. C.* § 1304(a) (emphasis added).

[59] *See, e.g.*, *Infinity Glob. Consulting Gp., Inc. v. Tilray, Inc.*, 2021 WL 880391, at *7 (C.D. Cal. Jan. 7, 2021) ("[A] plaintiff is not entitled to the remedy of setting aside a fraudulent conveyance unless he has shown that he is a creditor of the transferor.") (internal quotation marks omitted); *Woodard v. Funderburk*, 846 So. 2d 363, 366 (Ala. Civ. App. 2002) ("[W]hat might be considered 'a fraudulent conveyance is valid as to all the world except creditors of the grantor.'") (quoting *Bank of Lexington v. Jones*, 456 So. 2d 784, 785 (Ala. 1984)).

Section 1301(4) of DUFTA defines a "creditor" as "a person who has a *claim*."[60]   Similarly, a "debtor" is "a person who is liable on a *claim*."[61] Section 1301(3), in turn, defines a "claim" as a "*right to payment*, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."[62]  To be a creditor, therefore, one must possess (and allege) a "right to payment."  Likewise, to be a debtor, one must be liable on a "right to payment."   Because "[o]nly a creditor . . . has standing to pursue a claim to contest a debtor's conveyance of assets or property as fraudulent,"[63] Plaintiffs must satisfy DUFTA's definition of a "creditor" to have standing to bring a claim under DUFTA.

### 1.  Does a DUFTA Claim Make One a "Creditor" Under DUFTA?

To qualify as creditors under DUFTA, Plaintiffs must have some relationship with Defendants that provides them a "right to payment."  Plaintiffs assert they are "contingent creditors" of GFIH for purposes of Counts V–VII based on their DUFTA claims asserted against GFIH as transferees of the initial fraudulent

---

[60] 6 *Del. C.* § 1301(4) (emphasis added).

[61] 6 *Del. C.* § 1301(6) (emphasis added).

[62] 6 *Del. C.* § 1301(3) (emphasis added).

[63] 37 C.J.S. *Fraudulent Conveyances* § 42 (Mar. 2022 Update); *see id.* (observing that "noncreditors can find no relief under fraudulent transfer laws").

18

transfers, as alleged in Counts III and IV of the Complaint.[64]  They also assert that because they are contingent creditors of GFIH, they can bring claims against Genworth and Holdings as "transferees/recipients" of the fraudulent transfers at issue in Counts V–VII.[65]  For their part, as already explained, Defendants argue that a DUFTA claim cannot create the creditor status necessary to sustain a subsequent DUFTA claim.[66]  In other words, Defendants assert that a "right of payment" independent of DUFTA is required to have standing under the statute.[67]

To begin, I note there appears to be no Delaware case on point.  Neither party has found such a case, nor have I.  Since DUFTA is modeled on UFTA, a uniform act, I turn to the decisions of other jurisdictions interpreting the same (or substantially similar) model statutes for guidance.[68]

---

[64] SAC ¶¶ 148, 207 (alleging that Plaintiffs "became contingent creditors of GFIH" because of the Reinsurance Termination); *see also* PAB at 9–14.

[65] PAB at 3–4.

[66] DOB at 14; DRB at 10–13; Suppl. Post-Hearing Br. in Supp. of Defs. Genworth Fin., Inc., Genworth Hldgs., Inc. and Genworth Fin. Int'l Hldgs., LLC's Mot. to Dismiss Counts V, VI and VII of the Second Am. Compl. ("DSB") (D.I. 188) at 3–10.

[67] DOB at 14; DRB at 10–13; DSB at 3–10.

[68] Delaware courts may look to other states when interpreting uniform acts, particularly when there is no guidance from Delaware courts. *See, e.g.*, *Bragdon v. Bayshore Prop. Owners Ass'n, Inc.*, 251 A.3d 661, 683 (Del. Ch. 2021) (considering authority from other states that have adopted similar versions of the enforcement provision of the Delaware Uniform Common Interest Ownership Act where there was no applicable Delaware precedent); *DMS Properties-First, Inc. v. P.W. Scott Assocs., Inc.*, 748 A.2d 389, 393 (Del. 2000) (considering "decisions of other jurisdictions that have enacted a form of the

Defendants have cited several authorities for the proposition that a plaintiff must have an independent claim to bring an action under UFTA because UFTA is exclusively remedial in that it is designed to assist only in the collection of separate, independent claims.[69] Subject matter treatises and legal encyclopedias support this

---

Uniform Arbitration Act"); *Kronenberg v. Katz*, 872 A.2d 568, 598 (Del. Ch. 2004) (observing that a court "would likely look to decisions of other states interpreting the identical provisions in their versions of the Uniform [Securities] Act").

[69] *See, e.g.*, *Alliant Tax Credit 31, Inc. v. Murphy*, 924 F.3d 1134, 1151 (11th Cir. 2019) ("[A] fraudulent-transfer action is derivative of some other right to relief. [Plaintiff]'s approach would collapse into one the action and the claim that gave rise to that action. . . . [A] fraudulent-transfer action is predicated on a claim that already exists."); *Hanks v. Anderson*, 2021 WL 6428041, at *7 (D. Utah Dec. 16, 2021) ("[T]he only allegations which specifically mention these entities address their involvement in the alleged fraudulent transfers. The proposed amendment contains no specific allegations supporting an underlying 'right to payment' against these particular entities. . . . Thus, the proposed amendment fails to allege these entities are 'debtors' under Utah's Voidable Transactions Act, and any claim against these entities under this statute must be based on their status as transferees."), *report and recommendation adopted*, 2022 WL 111160 (D. Utah Jan. 12, 2022); *Kraft Power Corp.*, 981 N.E.2d at 681–82 ("As the language of the UFTA makes clear, an action for relief . . . depends on the existence of an independently valid claim. In other words, the remedies available under the UFTA furnish a convenient and expeditious method by which creditors may satisfy their claims but they do not create claims.") (internal quotation marks omitted); *In re Skinner*, 636 F. App'x at 870 ("The UFTA does not make one a creditor; instead it serves as a tool for creditors to recover fraudulent transfers."); *Deford*, 867 F.2d at 1087 ("The [UFTA] is not substantive in nature, but instead merely confers an alternate remedy for protecting preexisting creditor rights. *The creditor rights a party seeks to enforce must exist under independent law,* such as contract law . . . . The purpose of the statute is to grant creditors additional enforcement possibilities when a debtor transfers his assets to a third party.") (emphasis added) (citation omitted); *cf. Blumenthal v. Blumenthal*, 21 N.E.2d 224, 247 (Mass. 1939) ("The statutes upon which the present bill is based furnish a convenient and expeditious method by which creditors may satisfy their claims but *they do not create claims*.") (emphasis added). Even some of Plaintiffs' authorities indirectly support this proposition. *See, e.g.*, *SuVicMon Dev., Inc. v. Morrison*, 991 F.3d 1213, 1221 (11th Cir. 2021) (noting that "fraudulent transfer claims must be based on an underlying claim by a creditor

characterization of the statute,[70] as does language from cases interpreting UFCA, the prior model statute.[71] Indeed, Plaintiffs admitted earlier in this litigation that "[t]o bring a DUFTA action, a plaintiff must have a right to payment independent from DUFTA."[72]

Despite this apparent support for Defendants' portrayal of DUFTA as purely remedial, the cases upon which Defendants rely appear factually dissimilar from the present case, as Plaintiffs go to great lengths to point out.[73] For example,

---

which the creditor could have sought to satisfy out of the asset that was transferred" before observing that "as a distinct cause of action, a fraudulent transfer claim is a claim distinct from the claims on which it is predicated").

[70] *See, e.g.*, Peter Spero, *Fraudulent Transfers, Prebankruptcy Planning and Exemptions* § 1.22 (Aug. 2021 Update) ("Because a fraudulent-transfer action is predicated on a claim that already exists, *it does not include a claim for relief under, e.g., the UFTA . . . .* The distinction between the existence of a 'claim' that is a prerequisite to bring a UFTA action and 'claim for relief,' that is part of UFTA action, was clarified by the UVTA, which excludes from the definition of 'claim' a 'claim for relief' under the UVTA.") (emphasis added) (internal quotation marks omitted); 37 C.J.S. *Fraudulent Conveyances* § 43 (Mar. 2022 Update) ("There must be a debt due the creditor, as an independently valid claim, and the statutes do not create for creditors claims that do not already exist.") (footnotes omitted).

[71] *See* DSB at 7 (citing, among others, *Clark v. Rossow*, 657 P.2d 903, 904 (Ariz. Ct. App. 1982) (stating that the "fraudulent transfer conveyance act does not create a new claim"); *Lind v. O.N. Johnson Co.*, 282 N.W. 661, 667 (Minn. 1938) (stating that the fraudulent transfer statute is "remedial" and "does not vest in the judgment creditor any new rights or remedies not theretofore his"); *Jahner v. Jacob*, 515 N.W.2d 183, 185 (N.D. 1994) ("Without a debt enforceable against the transferor, a creditor has no claim against the transferee.")).

[72] *See* Letter to the Hon. Joseph R. Slights from Peter B. Andrews (D.I. 76) at 1.

[73] PAB at 14–18.

21

Defendants' authorities involve cases where the plaintiff was never a creditor to begin with,[74] the plaintiff lost creditor status,[75] or the plaintiff asserted standing based *only* upon an UFTA claim, as opposed to here where Plaintiffs have standing to invoke DUFTA, at least initially, based on their contractual entitlement to LTC coverage or sales commissions.[76] Perhaps the closest case to this one is *Crystallex International Corp. v. Petróleos De Venezuela, S.A.*, but there, the defendant was the transferee of an alleged fraudulent transfer as opposed to the transferor.[77] The factual scenario here is unique, at least in relation to the cases cited by the parties.

---

[74] *See, e.g.*, *In re Wickes Tr.*, 2008 WL 4698477, at *7–8 (Del. Ch. Oct. 16, 2008) (holding that the plaintiff lacked UFTA standing because she had failed to prove in a prior court action that her deceased ex-husband was liable to her for failing to make child support payments and therefore had no "claim" against his estate); *Harbinger Cap. P'rs Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218, 224 (Del. Ch. 2006) (holding that plaintiff, a preferred stockholder, did not hold debt and therefore was not a creditor with standing under the New York uniform fraudulent transfer act).

[75] *See, e.g.*, *Kraft Power Corp.*, 981 N.E.2d at 681–82 (fraud claim extinguished upon debtor's death); *RRR, Inc. v. Toggas*, 98 F. Supp. 3d 12, 19 (D. D.C. 2015) (judgment extinguished by passage of time).

[76] *See, e.g.*, *In re Skinner*, 636 F. App'x at 870 (rejecting the plaintiff's attempt to assert standing as a "creditor" based on the same UFTA claim for which it sought standing).

[77] *See Crystallex Int'l Corp. v. Petróleos de Venezuela, S.A.*, 879 F.3d 79, 84 (3d Cir. 2018) (reversing the lower court and holding that "transfers by non-debtors are not fraudulent transfers under DUFTA as it has been interpreted by Delaware courts"); PAB at 18 (distinguishing *Crystallex* on the grounds that "[t]he fatal problem with Crystallex's DUFTA claim was that the transfers in question had been made *to* Venezuela, not *by* it") (emphasis in original).

Moreover, Plaintiffs have identified authorities that suggest a claim under UFTA can, in and of itself, make one a "creditor" in certain situations. These include various authorities observing that UFTA and related uniform acts are simply "codification[s] of the common law of fraudulent transfer" and, therefore, "create[] a substantive cause[s] of action."[78] Perhaps the most persuasive authority Plaintiffs identify comes from the official comments of the UVTA, the latest uniform version of DUFTA. Comment 2 to Section 8 explains in part:

> A transfer of property by the transferee of a voidable transfer might, on appropriate facts, be avoidable for reasons independent of the original voidable transfer. In such a case the subsequent transferee may be entitled to a [good faith purchaser for value] defense to an action based on the original voidable transfer, but that defense would not apply to an action based on the subsequent transfer that is independently voidable. For example, supposed that X transfers property to Y in a transfer voidable under this Act, and that Y later transfers the property to Z, who is a good-faith transferee for value. In general, C-1, a creditor of X, would have the right to a money judgment against Y pursuant to § 8(b), but C-1 could not recover under this Act from Z, who would be protected by [the good faith purchaser for value exception]. *However, it might be the case that Y's transfer to Z is independently voidable as to Y's creditors (including C-1, as a creditor of Y by dint of its rights under this Act).* Such might be the case if, for example, the value received by Y in exchange for the transfer is not reasonably equivalent and Y is in financial distress, or if Y made the transfer with the intent to hinder, delay, or defraud any of its creditors. In such a case, creditors

---

[78] Pls.' Suppl. Mem. in Opp'n to Mot. to Dismiss ("PSB") (D.I. 190) at 11–12; *see also* 37 C.J.S. *Fraudulent Conveyances* § 137 (Mar. 2022 Update) ("A state fraudulent transfer statute can provide the basis for imposing personal liability on the transferee . . . ."); *Challenger Gaming Sols., Inc. v. Earp*, 402 S.W.3d 290, 295 (Tx. App. 2013) ("A fraudulent transfer under the UFTA is a tort."); *In re B.L. Jennings, Inc.*, 373 B.R. 742, 768 (Bankr. M.D. Fla. 2007) ("A fraudulent transfer under the UFTA is tortious conduct . . . .").

23

of Y may pursue remedies against Z with respect to that independently voidable transfer, and the defense afforded to Z [as a good faith purchaser for value] would not apply to that action.[79]

Put simply, according to this comment, when a transferee of an initial fraudulent transfer engages in a second fraudulent transfer, that second fraudulent transfer may be actionable both as a subsequent transfer and as an independent fraudulent transfer. This comment, Plaintiffs argue, "confirms that the creditor of the first fraudulent transfer (C-1) becomes a 'creditor' of the transferee 'by dint' of, or because of, the statute."[80]  Other authorities support the idea that, "[i]n a fraudulent conveyance by a debtor to avoid creditors, subsequent transferees may be liable to the debtor's creditors under specified conditions."[81]

I acknowledge, as Defendants point out, that the Comment's hypothetical is not directly analogous.[82]  In the hypothetical, the property being fraudulently

---

[79] Unif. Voidable Transactions Act § 8 cmt. 2 (Unif. L. Comm'n 2014) (emphasis added).

[80] PSB at 5–7.

[81] 37 C.J.S. *Fraudulent Conveyances* § 144 (Mar. 2022 Update); *see also Nisenzon v. Sadowski*, 689 A.2d 1037 (R.I. 1997) (finding that the plaintiff had an UFTA claim against his debtor's attorney based on Rhode Island's version of UFTA because the attorney was the transferee of a fraudulent transfer from the debtor and subsequently transferred the property to another entity).

[82] DSB at 5 n.4.  I note that Defendants also argue that Delaware has enacted only UFTA and not the new UVTA (with its explanatory comments), so it should not be entitled to weight. *See Kallop v. McAllister*, 678 A.2d 526, 530 (Del. 1996) ("In interpreting a statute, we give considerable deference written to an official commentary written by the statute's drafters and *available to the General Assembly before the statutory enactment.*") (emphasis added).  In *Kallop*, the Court held that "the official commentary to the UCC . . .

24

transferred from the initial transferor to the transferee and then from the transferee to the second transferee is the *same property*. That the uniform statute discourages this type of behavior makes perfect sense; Y is not immune from liability simply because she transferred the property she received by fraudulent transfer to another transferee. If Y's transfer met the other elements of a fraudulent transfer under the statute, then Y's transfer to Z may be independently voidable. In other words, C-1, a creditor of X, may be a "creditor" of Y as transferee of the property subject to the original fraudulent transfer.

This case is different. Defendants are not simply moving the same assets from entity to entity, using the corporate form to hide the fraudulent transfers. Instead, the "property" allegedly transferred in Counts III–IV is the amorphous (but real) value of the reinsurance agreements terminated by Defendants. The factual predicate of the fraudulent transfers at issue in Counts V–VII is that after the Reinsurance Termination occurred, GFIH sold its Canadian and Australian mortgage insurance assets—assets, which, although indirectly available to support GLIC when the reinsurance agreements were in place, were never GLIC's "property" that it owned or to which it had any contractual right. Liability is not imposed on "transfers

which existed when the Uniform Commercial Code was adopted in Delaware" supported a certain interpretation of the UCC. *Id.* But *Kallop* does not prohibit this Court from considering uniform law comments as persuasive authority, even if they are not entitled to "considerable deference."

25

of *non-debtor* property."[83]   Indeed, "the UVTA . . . confirms that 'claim' excludes relief awarded for the fraudulent transfer itself."[84]

All in all, the competing authorities make for a nice gumbo, but they don't provide a clear answer to the question of whether a claim under DUFTA, alone, can create creditor standing.  One the one hand, Defendants have extracted language from cases that strongly suggest a right to payment independent of DUFTA is necessary to make one a creditor for purposes of the statute.  But those cases are factually distinct.  On the other hand, Plaintiffs point to authorities, including commentary from the most recent version of the uniform act, that suggest a claim under DUFTA is itself enough to create creditor status.  But that commentary presents an illustrative hypothetical that is also factually distinct.  Even so, the commentary does support the notion that the uniform statute, at least in some narrow circumstances, does expressly contemplate a scenario whereby a plaintiff has a

---

[83] *In re NewStarcom Hldgs. Inc.*, 816 F. App'x 675, 678 (3d Cir. 2020).  Plaintiffs assert that "UFTA's express terms permit[] a creditor to recover not only transferred assets or the proceeds from any sale of those assets, but also 'other property of the transferee.'" PSB at 13 (citing *Robinson v. Coughlin*, 830 A.2d 1114, 1118 (Conn. 2003)).  Even if that is true, however, just because a creditor may recover on more than just the transferred assets does not necessarily mean that liability can be imposed on transfers of *non-debtor* property.  As Defendants point out, such a rule could "spawn an endless chain of voidable conveyance claims against an unlimited number of unrelated transactions by affiliated corporations."  DSB at 10 (internal quotation marks omitted).

[84] *Alliant Tax Credit*, 924 F.3d at 1151.

"claim" solely "by dint of its rights under [the] Act."[85] In other words, while the commentary and Plaintiffs' other authorities are not definitive, they do cause me to hesitate to declare as a matter of law that DUFTA standing can never exist in the absence of a claim independent of a claim for fraudulent transfer.

For reasons explained below, no such definitive declaration is required here. As noted, Defendants have argued alternatively that even if a claim under DUFTA could be the basis of another actionable fraudulent transfer claim, Plaintiffs do not plead a "right to payment" as a predicate to their claims in Counts V–VII. In other words, even if Plaintiffs could potentially be "creditors" of GFIH by virtue of their DUFTA claims in Counts III–IV, they cannot meet the definition of "creditor" because they do not have a "claim," given that they do not plead (and will not receive) a "right to payment" in Counts V–VII. As explained below, I agree.

## 2. Plaintiffs Have Not Well-Pled Creditor Status in Counts V–VII

As noted, a "claim" under DUFTA is defined as "a *right to payment*, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."[86] While this definition of "claim" is certainly broad, the plain meaning of the statute

---

[85] Unif. Voidable Transactions Act § 8 cmt. 2 (Unif. L. Comm'n 2014).

[86] 6 *Del. C.* § 1301(3) (emphasis added).

27

requires that any claim that is to meet this definition must ultimately comprise a "right to payment." Plaintiffs assert they are "creditors" under DUFTA for purposes of Counts V–VII by virtue of their claims in Counts III–IV, but Plaintiffs have not actually pled any right to payment from GFIH (or any subsequent transferee) in their Complaint.

In Counts III and IV, the Complaint asks the Court to "[e]nter an appropriate order requiring defendants to *unwind* the Reinsurance Termination and *restore* to GLIC from Genworth, Holdings, and GFIH all of the value fraudulently transferred from GLIC in the Reinsurance Termination."[87] There is no claim for money damages, and no judgment for money damages will be entered if Plaintiffs prevail on Counts I–IV.[88] Nevertheless, the claims are based on a "right to payment"—for the policyholders it is a right to payment of insurance benefits and for the insurance

---

[87] SAC at 85 (Prayer) (emphasis added).

[88] Not only do Plaintiffs fail to plead damages, but it is hard to see how they would be entitled to them even if they had. As the Court observed in *Burkhart I*, Plaintiffs' alleged injury is a risk of future harm—"an unmature and contingent claim." *Burkhart I*, 250 A.3d at 855. I agree with Defendants that "[a] damages award to Plaintiffs who have not yet suffered damages in not contemplated by DUFTA, or contract law, or common sense." DRB at 7. After all, "[t]he overarching goal in applying [remedies under UFTA] is to put a creditor in the position she would have been in had the fraudulent transfer not occurred." *August v. August*, 2009 WL 458778, at *10 (Del. Ch. Feb. 20, 2009); *see also id.* at *10 n.62 (collecting cases from other jurisdictions supporting this point); DRB at 8 ("Permitting current damages would not put Plaintiffs in the position they were in in 2016[;] it would give them a windfall.").

agents it is a right to sales commissions. There is, therefore, a "claim" upon which the DUFTA claims rest.

As they requested in Counts I–IV, in Counts V–VII, Plaintiffs request that the Court "[e]nter an appropriate order *unwinding* the Canada/Australian MI Transfers and *restoring* to GFIH all of the value fraudulently transferred to Genworth and Holdings by means of the Canada/Australian MI Transfers."[89] But this is where the similarity ends. Unlike Counts I–IV, which are expressly predicated upon contractual rights to payment, Counts V–VII rest on claims which, if reduced to judgment, will not create any right to payment at all, but instead will result in the unwinding of certain transactions and the restoration of others.[90] In short, because

---

[89] SAC at 85 (Prayer) (emphasis added).

[90] To expand on this point, the claims that were the subject of *Burkhart I* provide an illustrative contrast with respect to what is a "claim" and what is not a "claim." In *Burkhart I*, I held that Plaintiffs had standing to pursue their fraudulent transfer claims as asserted in Counts I–IV. Recognizing the broad definition of "claim" under DUFTA, I held Plaintiffs are contingent creditors of GLIC based on their contractual right to LTC insurance coverage or sales commissions even though those claims had not yet matured and may never mature. *See Burkhart I*, 250 A.3d at 854–55 ("[A] creditor with an unmature and contingent claim does have standing to bring a claim under the DUFTA even though her contractual right to payment is contingent and not yet mature."). Put simply, Plaintiffs held "contractual right[s] to payment" against GLIC based on underlying enforceable contracts. *Id.* at 855. And they are entitled to pursue their "claims" against both the transferor and the transferee(s). In this regard, Plaintiffs correctly note that "[t]he plain text of the statute makes no distinction between sources of a 'right to payment,'" so the "right to payment" need not be contractual in nature. PAB at 12; *see also id.* at 19 ("The case law on fraudulent transfer is replete with 'claims' (as defined in DUFTA) that arise outside of contracts. There are cases involving tort claims . . . marital claims . . . and claims based on statutes."). But, as explained, even if a DUFTA claim could create the necessary "right to payment" separate from any contractual right to payment, Plaintiffs would receive

29

their DUFTA claims in Counts III–IV do not and will not themselves create a "right to payment," Plaintiffs are not "creditors" under DUFTA for purposes of Counts V–VII and cannot, therefore, state claims under the statute with respect to those transfers.[91]

---

no right to payment via their DUFTA claim as asserted in Counts V–VII (based on the alleged fraudulent transfers as alleged in Counts III and IV) because they will receive no money judgment even if they prevail on Counts III and IV. *Cf. Nisenzon*, 689 A.2d at 1044 (holding that a fraudulent transfer claim reduced to a money judgment can evince a "right to payment" such that it could create creditor status for a separate fraudulent conveyance claim under the uniform act).

[91] At the risk of unnecessary belaboring, a count-by-count analysis may provide additional clarity. Counts I and II—brought against GLIC, Genworth, Holdings and Genworth NA—allege that those Defendants caused the GLIC Dividends to occur when GLIC was inadequately capitalized and/or insolvent, and the transfers were made for no consideration. Plaintiffs are contingent creditors of GLIC because they have a contractual right to payment of LTC insurance benefits or sales commissions, and the other Defendants (Genworth, Holdings and Genworth NA) controlled GLIC and were transferees and beneficiaries of those alleged fraudulent transfers. The same goes for Counts III and IV. As previously explained, Plaintiffs allege that Genworth, Holdings, GFIH and GLIC terminated the reinsurance agreements to defraud creditors of GLIC, including Plaintiffs and other members of the class. Plaintiffs' "right to payment" (LTC insurance benefits or commissions) from GLIC creates contingent creditor status *with GLIC*—the fraudulent transferor—and the rest of the Defendants named in Counts III and IV are Genworth-controlled transferees who allegedly caused the Reinsurance Termination to occur. But Plaintiffs' lack of a creditor/debtor relationship with GFIH presents an entirely different situation for Counts V–VII. Those counts are not anchored by Plaintiffs' contractual right to payment from GLIC (indeed, GLIC is not named as a defendant in Counts V–VII). Instead, as explained, Plaintiffs assert that the claims against GFIH in Counts III and IV themselves provide the necessary "right to payment" to create a creditor/debtor relationship between Plaintiffs and GFIH even though no separate right to payment is alleged or provable there. That is where the amended fraudulent transfer claims fall flat.

30

Perhaps the closest thing to any "right to payment" Plaintiffs have pled is found in paragraph F of their prayers for relief. There, Plaintiffs ask the court to "[e]nter Judgment for the Plaintiffs and the Class against Genworth, Holdings, Genworth NA, GLIC and GFIH for the value of the Fraudulent Transfers to the extent necessary to satisfy the expected claims of the Plaintiffs and the Class."[92] Plaintiffs assert that this language amounts to a prayer for damages.[93] I disagree. It would have been easy enough for Plaintiffs to put Defendants on notice that they are seeking damages by pleading for "damages," but that word appears nowhere in the prayer for relief or in the rest of the Complaint. Indeed, paragraph 29 of the Complaint asserts that "the damage the Fraudulent Transfers have caused and will cause *can be remedied only by injunctions* requiring the unwinding of the GLIC Transfers" and "setting aside the Canada/Australian MI Transfers."[94] An injunction, by definition, provides no right to payment.[95]

---

[92] SAC at 86 (Prayer).

[93] PAB at 10.

[94] SAC ¶ 29 (emphasis added). This, of course, makes perfect sense given that no member of the putative class has yet to be denied LTC insurance coverage or sales commissions for sales of LTC policies such that money damages could be calculated with even a remote degree of reliability.

[95] *See State v. Del. State Educ. Ass'n*, 326 A.2d 868, 875 (Del. Ch. 1974) (holding that injunctive relief is only appropriate when money damages are inadequate).

Plaintiffs also argue they have pled an "equitable" right to payment, which is sufficient under DUFTA.[96]  DUFTA expressly provides that an equitable "right to payment" qualifies as a "claim,"[97] but I disagree with Plaintiffs that they have pled an equitable right to payment here.  Equitable relief, by itself, is not an equitable "right to payment."[98]

There is another reason to find that Plaintiffs have not asserted a "claim" here.  As observed earlier, the law is settled that liability under DUFTA will not imposed on "transfers of *non-debtor* property."[99]  But that is precisely what Plaintiffs allege

---

[96] PSB at 10 n.8.

[97] *See* 6 *Del. C.* § 1301(3) ("'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, *equitable*, secured or unsecured.") (emphasis added).

[98] In this regard, Plaintiffs cite to *Wiand v. Lee*, 753 F.3d 1194 (11th Cir. 2011).  *Wiand* is inapposite.  In that case, a receiver sought to recover transfers made to investors in a Ponzi scheme.  The Eleventh Circuit affirmed the district court's ruling that the entities in receivership were "creditors" under Florida's version of DUFTA because they had a "claim" against the Ponzi scheme organizer when he "transferr[ed] assets rightly belonging to the corporations and their investors in breach of his fiduciary duties."  *Id.* at 1203.  But there, unlike in this case, the receiver had actually requested, was entitled to, and received a monetary award from the defendants.  *See id.* at 1203–04 ("Since the undisputed facts show that Nadal's transfers to the Lee Defendants satisfy all the elements of FUFTA [Florida's adoption of UFTA], the district court's grant of summary judgment in favor of the Receiver is due to be affirmed *as is the judgment for the receiver and against the Lee Defendants in the amount of $935,631.51*.") (emphasis added).  That is simply not the case here.

[99] *In re NewStarcom Hldgs.*, 816 F. App'x at 678 (emphasis in original); *see also id.* ("Fraudulent transfer liability under DUFTA does not attach to a transfer by a *non-debtor*.") (citing *Crystallex Int'l*, 879 F.3d at 81, 84–86).

occurred in Counts V–VII.[100]  This is not a case where Plaintiffs allege that GFIH, as GLIC's transferee, fraudulently transferred property it received from GLIC in order to facilitate GLIC's avoidance of a right to payment.  Rather, it is alleged that GFIH transferred its own assets—assets over which GLIC had no claim or rights.  This, alone, takes the transfers outside the realm of DUFTA.

As a final note, I am sympathetic to Plaintiffs' argument that "absent the relief sought in Counts V, VI, and VII, Plaintiffs' victory on their Count III and IV claims could be pyrrhic."[101]  Of course, I have no desire to convert DUFTA into "dead letter against complex corporate groups," as Plaintiffs argue might be the case if Defendants prevail here.[102]  And I wholeheartedly agree that DUFTA should "provide[] for flexible, open-ended remedies to enable a court to fashion a just, equitable outcome in a particular case."[103]  Nevertheless, I am obliged to construe

---

[100] *See, e.g.*, SAC ¶ 151 ("GFIH engaged in a series of transactions by which it transferred *its interests* in Genworth MI Canada and Genworth MI Australia . . . .") (emphasis added); SAC ¶ 152 (explaining that Plaintiffs seek "a restoration of the Capital Maintenance Agreement through which *GFIH's assets (i.e., its interests in Genworth Canada and Genworth Australia)* were available to back BLAIC's reinsurance obligations to GLIC") (emphasis added); SAC ¶¶ 153, 157, 162, 164 (identifying shares in the international mortgage insurance subsidiaries as assets of GFIH); SAC ¶ 18 ("GLIC has no interest in GFIH or its subsidiaries.").

[101] PAB at 29.

[102] *Id.*

[103] *SE Prop. Hldgs., LLC v. Center*, 2018 WL 279989, at *3 (S.D. Ala. Jan. 2, 2018).

DUFTA's provisions and definitions by their plain terms.[104] For reasons just explained, I am not persuaded that Plaintiffs ever pled (or would be entitled to) any right to payment from Defendants with respect to Counts V–VII. Because a "right to payment" is a necessary predicate to a viable DUFTA claim, Plaintiffs have failed to state a claim in Counts V–VII as a matter of law.[105]

## III. CONCLUSION

For the foregoing reasons, the motion to dismiss Counts V–VII must be GRANTED.

**IT IS SO ORDERED.**

---

[104] *George & Lynch, Inc. v. Div. of Parks and Recreation, Dep't of Nat. Res. and Env't Control*, 465 A.2d 345, 350 (Del. 1983).

[105] Plaintiffs argue that the Court should not dismiss Count VII because Defendants do not address Count VII in their opening brief and thus "that aspect of their motion to dismiss has been waived." PAB at 22. They also argue that "Count VII is a broad invocation of the Court's equitable powers under DUFTA § 1307, for relief with respect to *all* of Plaintiffs' claims in the Second Amended Complaint in Counts I-VI." PAB at 23 (emphasis added). I disagree on both fronts. First, Count VII is mentioned in Defendants' opening brief many times and is subject to the same arguments regarding dismissal as Counts V and VI. *See* DOB at 3–5, 11–13, 17, 20 (addressing Count VII); *id.* at 13 ("Counts V, VI *and VII* of the SAC Fail to State a DUFTA Claim") (emphasis added). Second, as pled, Count VII does not apply to all of Plaintiffs' other claims. It does not refer to Counts I–IV or incorporate those counts by reference. Indeed, it is labeled "The Canada/Australia MI Transfers," like Counts V and VI, and it is brought against only the Defendants named in Counts V and VI. *See* SAC at 84. Count VII, therefore, suffers from the same fatal flaws that plague Counts V and VI. With that said, I agree with Plaintiffs that "Section 1307 of DUFTA equips the Court with several flexible tools" to provide relief should Plaintiffs prove that fraudulent transfers have occurred. PAB at 25; 6 *Del. C.* § 1307. Accordingly, should Plaintiffs succeed on the surviving claims (Counts I–IV), the Court can and will craft an appropriate remedy.

34